## JOHN E. EMSWILER *v.* THOMAS N. BURHAM, Sheriff.

The chapter of the Civil Code regulating the revocatory action, is not applicable to cases of simulation. In cases of simulation the sheriff may seize, notwithstanding the apparent transfer of the property by the defendant in execution.

Fraud may always be proved in support of the allegation of simulation in the transfer of property.

A sale of all of a person's real and personal estate, is not a sale in the usual course of business. Where such a sale is made by a married man to an unmarried brother, who was his clerk and who lived with him, followed by no apparent change of possession, the *onus* of proving the reality of the transaction is thrown upon the vendee.

APPEAL from the District Court of Morehouse, *Copley*, J.  *Newton*, and *McGuire* and *Ray*, for plaintiff, contended : It is well settled by the decisions of this court, that when a person is in possession of immovables under a conveyance not void on its face, the question of fraud cannot be inquired into collaterally by commencing with a seizure. *Kirkland* v. *Gas Bank*, 1st Ann. 300 ; *Lindeman* v. *Theobald*, 2d Ann. 913 ; *Oglesby* v. *Drake*. 3d Ann. 641 ; *Morton* v. *Crosby*, 14 L. R. 426 ; *Drummond* v. *Clinton* and *P. H. Railroad*; 7 R. R. 237. In this case the sale of the town lots was, by notarial act, duly recorded, and delivery given therein by the vendor, *G. W. Emswiler*, to *J. E. Emswiler*, and by the latter acknowledged ; and the seizing creditors, *J. Burnside & Co.*, knew of the existence of the sale before the seizure, as they had previously instituted a suit to set it aside.

In the case of *Morton* v. *Crosby*, 14 L. R., 424 to 427, under a state of facts almost exactly similar to the case before the court, it was expressly held, that when "the sale is of slaves by authentic act and possession given by the deed itself, and knowledge of the existence of the contract brought home to the seizing creditor," the sale could only be set aside by a direct revocatory action, and could not be inquired into collaterally by commencing with a seizure. This decision is referred to in the case of *Kirkland* v. *Gas Bank*, 1st Ann. 300. At all events, the only question that can be inquired into in this suit, in regard to the transfer of the town lots from *G. W.* to *J. E. Emswiler*, is whether *J. E. Emswiler*, plaintiff, was in possession at the time of the seizure, as it is only in the absence of that event that it could be considered a simulated sale, and no question of fraud can be inquired into in such a proceeding as this. Plaintiff shows by the notarial deed to him, that he purchased the town lots for $2000—$1300 in cash, and $700 payable in twelve months—and received possession of them on the 19th April, 1849; and by the witnesses to the deed, *Sharp* and *Newton*, he proved the payment of the $1300 in cash, and the delivery of the note for $700, as stated in the deed. *Newton*, witness, in his testimony, explains why the deed was passed at night and in the store of plaintiff; at the time this deed was passed, it does not appear that any suit had been brought against *G. W. Emswiler*, nor the firm in which he was a partner. The suits offered in evidence, inlcuding that of *J. Burnside & Co.*, were instituted in the months of October and November, 1849, and the indictment for perjury against *G. W. Emswiler*, which caused him to leave the State, was filed the 22d November, 1849, and the proceeding out of which it grew is alleged in the indictment to have taken place on the 29th October, 1849, all long subseqnent to the sale; these facts are certainly no evidence of simulation, if they do not entirely preclude such an interference. *J. Burnside & Co.* set up simulation in their answer—the *onus* of proving it, lies on them. *Lindeman* v. *Theobald*, 2d Ann. 913. *Morton* v. *Crosby*, 14 L. R. 426.

The allegations in their answer, to show simulation, are: 1st. That there was never any delivery of the property to the vendee; and 2d. That the consideration was never paid. The evidence is voluminous, but a careful examination of it will show that *George W. Emswiler* (whom the witnesses call *Dr. Emswiler*) and *John H. Emswiler*, came to Morehouse parish and commenced merchandising under the firm of *J. H. Emswiler & Co.*, a year or two before the plaintiff, *J. E. Emswiler*, came; the plaintiff acted as clerk for them after his arrival. At the time of the sale, 19th April, 1849, *G. W. Emswiler* lived on the lots, and plaintiff, *J. E. Emswiler*, was living in the house with him; *G. W. Emswiler* had a family, and *J. E. Emswiler* was his nephew and a single man; *G. W. Emswiler* continued to reside in the house, and acted as the "head of the house" until he left, which was at the time the indictment was found against him at the November term of court, 1849; his family remained in the house for some time after he left; they had left before the seizure. Plaintiff continued to live in the house until after *G. W. Emswiler* and his family left, then he went out to board. No improvements were made on the lots after the spring of 1849, the time the sale was made by *G. W. Emswiler*. The attention of the court is particularly called to the testimony of *Boatner*, who seems to have been more intimate than any one else with the *Emswilers*, in relation to the control of the property after the sale; *Henderson*, it will be noticed, was not much about the *Emswilers* after the sale, on account of not being on speaking terms with *G. W. Emswiler*. The sale of the 19th April, 1849, was known to all the witnesses, and was generally known.

All the evidence relied on to disprove possession in *J. E. Emswiler*, is of that negative kind that ought to have but little weight. The vendor and vendee residing together in the same house—the vendor with a family, the other a single man—it is quite natural that the former should seem to control the premises; an opposite course of conduct would have appeared unnatural, and have shown an intention to defraud. There was no attempt to deceive any one; all knew, and none better than *J. Burnside & Co.*, that the sale had been made. It is in evidence, likewise, that *J. E. Emswiler* is a steady business man, whilst the others were not. It has been expressly held by this court, that when the vendor and vendee reside in the same house, that possession follows title. *Wafre* v. *Pratt*, 1 R. R. 41, 42. *Richard* v. *Nolan*, 3 N. S. 338. *Lindeman* v. *Theobald*, 2d Ann. 912.

There is proof positive of the payment of the consideration for which the sale of the 19th April, 1849, was made, and there is certainly no evidence to cast a

doubt or suspicion upon the genuineness of the payment. Under all the circumstances, (the sale being by notarial act duly recorded, which all were legally bound to take notice of, and which was not made a secret but generally known,) the consideration proved to have been paid, and the vendor and vendee residing in the same house, and no proof of an object for a simulated sale at the time it was made. The court, under the rule laid down in the decisions already quoted, will not permit plaintiff to be disturbed in his possession by a seizure under a *fi. fa.*, as has been attempted in this case. The seizing creditors will, at all events, be required to attack the sale directly as a fraudulent one, before they can have the property seized and sold. The personal property seized under the *fi. fa.* in favor of *J. Burnside & Co.*, claimed by plaintiff, was the stock of merchandise in the store-house, and some other personal property; all of which was sold at the sheriff's sale for $721.

It is not denied but that the question as to who is the true owner of the personal property may be inquired into in this suit. The first inquiry then, is, was *J. E. Emswiler*, plaintiff, in possession of the store and merchandise at the time of the seizure, as owner?. The whole of the parol evidence will have to be carefully examined and weighed to come to a correct conclusion, as though not contradictory, it is very diffuse, and much of it of a negative character. It would not assist the court for us to refer to the evidence in detail, but we would merely state that we rely much on the testimony of *Pride, Sharp, Hendrix, Beacham,* and *Boatner*; *Johnson* is important, and *Jelks*. This evidence is positive that *J. E, Emswiler*, plaintiff, was in possession at the time of the seizure; if he was not, no one was. During the year 1849, all the business about the store was conducted in his name; the accounts were made out in his name and collected by him; he assumed the entire control of the store, and solicited custom for it in his own name. If plaintiff has shown that at the time of the seizure of the merchandise he was in possession as owner, then it devolvës on defendant to show that he was not owner. He who alleges fraud must prove it, and it cannot be contended that the evidence in this case makes that even probable. All the evidence offered as to this point, is, as to the declarations and acts of *Dr. G. W. Emswiler*, and not in the presence of the plaintiff, *J. E. Emswiler*, which can amount to no more, at best, than proving fraud in *Dr. Emswiler*, but not in *J. E. Emswiler*: this is well settled by this court. *Graves* v. *Steel*, 2d Ann. 482. 2 N. S. 13. 3 N. S. 23.

In regard to the twelve months' bond of *Chesley Johnson* for $220, seized under the *fi. fa*, in favor of *Taylor* and *Rayne*, although they set up a formidable defence in their answer, yet they did not offer any evidence to establish the fraud and simulation alleged. The pleadings admit that the twelve months' bond was taken out of plaintiff's possession by the sheriff, at the instance of *Taylor* and *Rayne*, who gave the sheriff an indemnifying bond. It was certainly the duty of the defendants to show the fraud and simulation they allege, after plaintiff's possession was admitted; the bond was payable to plaintiff, but it being out of his possession, he could not produce it, and defendants failed to do so. Plaintiff is entitled to a judgment restoring him in his possession of said bond, or for judgment against defendant for the amount, if it is not returned.

*Richardson* and *Todd*, for defendant, contended: 1st. Simulated sales are not contracts; they may be attacked by commencing with a seizure, without being subjected to the provisions of the code, for the annulment of fraudulent contracts by revocatory actions. C. C. 1754, 1772. 2 Zacharie 341, sec. 313; notes. 24 Pothier Pand. 432—1, 5 to 17. Merlin *verbo* Simulation. 13 L. R. 129. 9 R. R. 491. 2d Ann. 323. 1st Ann. 132. Ib. 262. 5th Ann. 1. It is difficult to draw the distinction between simulation and fraud. It is very evident that simulation cannot exist without fraud, both on the part of the vendor and vendee, and it is equally true that fraud may exist without simulation. To say, then, that fraud cannot be inquired into collaterally, would be to debar us from the proof of simulation: as fraud is the very basis of simulation, they are always co-existent and cannot be disconnected. We apprehend, therefore, that the doctrine advanced by the appellant, and the law quoted to sustain it, to wit: "That fraud cannot be inquired into, collaterally, by commencing with a seizure," applies solely to sales or contracts which are real, though fraudulent, and not to cases where simulation is alleged; for a simulation sale is no contract at all, as there is no reality about it, and affects neither the title nor possession of the original owner, so far as his creditors are concerned. Under this view of the case, evidence would be perfectly admissible to prove the motive for the simulation;

that is, the large indebtedness of the vendor at the time and previous to the sale, and his object to defeat the claims of his creditors by this simulated transfer of his property ; and this doctrine is fully recognized in many of the decisions above quoted, and particularly in 5th Ann. 1, in the case of *Erwin* v. *Bank of Kentucky*. And the appellant impliedly admits this doctrine, when he asserts "that there was no proof of an object for a simulated sale at the time it was made," though, in another place, he seeks to confine us to the question whether appellant was in possession at the time of the seizure. In further answer to appellants counsel on this point, that fraud cannot be inquired into, collaterally, by commencing with a seizure, we would cite the court to the case of *Fisher* v. *Moore*, 12 R. R. 95, where it is held, that "though a creditor cannot treat a conveyance of real estate, alleged to be fraudulent as null, and seize under a *fi. fa.* the property in the hands of his vendee ; yet, if the latter do not enjoin the proceedings, but permits the sheriff to seize and sell the property, as still belonging to his vendor, and afterwards sues the purchaser at the sheriff's sale to annul the sale, and cause himself to be declared owner of the property, the creditor, cited in warranty, may plead by way of exception, whatever he might have urged in a direct action to annul the first sale." This is virtually such an action as above described, the plaintiff seeks "to be declared owner of the property;" and although the purchasers of the property at the sheriff's sale are not before this court, yet the counsel contend, that "their title must abide the decision of this case ;" and it follows, then, that from analogy to the above cited case, that it would be both legal and equitable, that the seizing creditors, who are before the court as warrantors, should be permitted to plead, by way of defence, in their own behalf and that of the purchasers, whatever they might have urged in direct action to annul the sale. As to the sale of the 19th of April, 1849, under which plaintiff sets up title, being simulated, we are confident that the record establishes the clearest case of simulation that has ever been presented to this court, and it is only necessary to give a brief history of the conduct and acts of the parties prior to, at the time of, and subsequent to the sale, to show this fact conclusively. The evidence shows that *G. W. Emswiler,* whom witnesses call *Dr. Emswiler,* and *J. H. Emswiler* came to Bastrop in or about 1846, and established themselves in the mercantile business,—the Doctor also pursuing the practice of medicine ; that after a year or two, plaintiff, *J. E. Emswiler,* arrived and became a clerk in the house, in which capacity, it is admtted, he acted up to the time of the sale in 1849. *G. W. Emswiler* was a man of family, and *J. E. Emswiler* a single man—a minor and apparently without means, and nephew of *G. W. Emswiler*. *Dr. G. W. Emswiler* took great interest in the improvement of his property up to and at the time of sale, and never signified any intention of removing from the place. That at this time, (time of sale,) *G. W. Emswiler* was largely indebted, so much so that he was hopelessly insolvent. At this time, while so much involved, and when the property sold was levied on under execution, as shown by act of sale itself, *G. W. Emswiler* made a *cessio omnium bonorum* to plaintiff, if at that time he sold the goods and merchandise as alleged, but of which there is no proof. This act of sale, besides the property in controversy, includes three slaves, one of which acted as nurse for plaintiff's aunt's child, and another as cook for the family. The plaintiff, not being a man of family, it was such property as he had no earthly use for, while it was just such property as *G. W. Emswiler* needed, and with the use of which he would not voluntarily have dispensed.

2d. The circumstances attending the passing of the act of sale, were sufficient to raise a strong presumption of simulation. The parties seemed desirous of cloaking the transaction from the public. They chose a late hour of night for the execution of the deed, one of the witnesses being called on when about retiring to bed. They sent for the notary before whom the act was passed, though his office was but a short distance off, some sixty or seventy yards, a very unusual proceeding as stated in the testimony. The act was drawn up at the solicitation of *G. W. Emswiler,* the vendor, who seemed the only actor in the matter. The parties were very particular about counting out the money and having the payment made in presence of the witnesses, a circumstance that seldom or never takes place in a *bonâ fide* sale, as it is only in pretended or simulated transfers that parties are so scrupulous about mere formalities. Another circumstance attending the sale, to which we especially direct the attention of the court : The consideration of the sale purports to be the sum of two thousand dollars, one thousand three hundred in cash, and the balance secured by note. By reference

to the answer of *J. E. Emswiler* in the suit of *Pinckard* and *Henderson* v. *J. H.* and *G. W. Emswiler et al.*, which was an action to annul this very sale, it will be seen that he states that a short time before, *G. W. Emswiler* was indebted to him in the sum of three thousand dollars, which he does not pretend was ever paid; yet, according to the act of sale, the plaintiff, *J. E. Emswiler*, paid thirteen hundred dollars in cash to *G. W. Emswiler*, and executed his note for seven hundred, while, if the allegation of the plaintiff in his said answer be true, *G. W. Emswiler* was indebted to him, at that time, three thousand dollars. It evidently shows that the parties, in their efforts to show the means of the vendee, have overreached themselves, which always happens with the best laid schemes of fraud.

3d. The acts and conduct of the parties subsequent to the sale, will expose more glaringly its entire simulation and falsity. No change takes place in the position of the parties. *G. W. Emswiler* still continued to reside on the lots, hold possession of the property, and exercise ownership over it as he had done hitherto; all who testify in regard to it, state that they saw no change whatever. The slaves that were included in the act, still continued in the employment of vendor's family, performing the same service as before. *Dr. Emswiler* still continued to manifest the same interest in the property; he made contracts with and hired workmen to prepare the timbers and lumber for removing his storehouse and repairing his buildings, and had the timbers hauled for the purpose of commencing the improvements. We would also refer the court to the strenuous efforts made by the vendor, *G. W. Emswiler*, to shield his property from his creditors, and the singular and fraudulent device resorted to for that purpose, of attempting to have judgment rendered against himself in the name of *Smurr*, so as to cover his property with the judgment. This was the state of things between the parties to the sale, when *G. W. Emswiler* was forced to leave the State and abandon possession of the property, as admitted by appellant's counsel, to avoid an arrest under an indictment for perjury. This indictment was found against him on the 22d of November, 1849, many months after the sale. We see, then, that when he left he took with him the boy *Henry*, one of the slaves embraced in the act of sale, and that about the same time, or shortly after he left, the other negroes disappeared. Other witnesses concur in stating that they heard no complaint from the plaintiff whatever, of the doctor taking off his property. This fact, of itself, would fully demonstrate the entire falsity and simulation of the deed in regard to the slaves; and the maxim would well apply, "*falsus in uno, falsus in omnibus.*" In regard to the vendee and plaintiff in this case, it is not contended that he exercised any ownership or control over the property embraced in the act of sale. he remained entirely passive; and it is admitted by appellant's counsel, that the vendor seemed to control the premises. We find that the vendee only stayed upon the premises as long as the family of *G. W. Emswiler* remained there, and when they left he went out to board. We would ask, here, if the plaintiff really bought the property, why did he not continue on it, retain the servants and keep up the establishment? It will be seen, too, that after the vendee left, that a servant was hired to attend the family during the time they remained. These facts, of themselves, show most conclusively that plaintiff never had any ownership or possession of the property. The naked title was vested in him, nothing more. It will be seen from the evidence, that about the time the act of sale was passed, and it may be regarded as one transaction, *G. W. Emswiler* pretended to transfer also to the plaintiff, all the notes, accounts, rights, credits, &c., due to himself and the firm of which he was a member; that his mode of transferring them was by writing the transfer on the back of the notes, judgments, &c., not in the presence of the plaintiff, without making any calculation of the amount or list of the debts; that after said transfer, he, *G. W. Emswiler*, took as much interest as before in the collection of the debts, and though plaintiff appeared on the face of them as owner, yet he would neither settle nor arrange them, except at the dictation and under the instructions of *G. W. Emswiler*. In connection with this, it will appear that in the suit of *Dwight* and *Trowbridge* v. *J. H.* and *G. W. Emswiler*, plaintiff was garnisheed in that case, and interrogatories were propounded to him, in which he was asked if he was not indebted to *G. W. Emswiler*; if he had not in his possesssion notes, accounts, &c., belonging to the firm of *J. H. Emswiler & Co.*, or either member of the firm: personal service of the garnishment was made upon him, yet rather than answer the interrogatories, he permitted judgment to be rendered against him to the amount of several hundred dollars.

Against this powerful array of facts, which go to establish simulation so conclusively, and particularly in regard to the continued possession and acts of the vendor subsequent to the sale, appellant's counsel seek refuge behind the principle of law invoked by them, that when vendor and vendee reside in the same house, possession is presumed to follow title; this means nothing more than this, that as by public act, delivery passes by the act, so when parties reside together delivery is presumed to follow title. But we apprehend that even if they do reside together, that this presumption will not arise where the vendor continues in possession and is suffered to act as owner, at least such a presumption will be entirely rebutted by the fact of such conduct on the part of the vendor, and such sufferance on the part of the vendee. And we are fully borne out in this opinion by articles 1915, 2456 C. C. *Thibodeaux* v. *Thomasson*, 17 R. R. 353. *Lindeman* v. *Theobalds*, 2d Ann. 912. The last case cited, and which is also referred to by appellant's counsel, so far from warranting the conclusions which they seek to deduce from the principle invoked, establishes fully the doctrine for which we contend, "that continued possession by a vendor, acting as owner, after a sale, creates the presumption of simulation, and imposes on the vendee, as to third persons, the burden of proving the reality of the sale." This decision also fully explains the meaning of the principle invoked by appellant, it is therein stated that where the parties live in the same house, the fact of the vendor remaining on the premises, is not of itself a badge of fraud; but it is intimated also, that though such may be the position of the parties to the sale, that when the vendor continues in possession and acts as owner, then the presumption of possession following title ceases, and the presumption of simulation will arise, and it will impose upon the vendee the burden of proving the reality of the sale. It will follow from the above, that though the parties to this sale may have resided together on the premises after the sale, yet if the court is satisfied that the vendor continued to act as owner, which is admitted by counsel for appellant, then we have so far made out our case, that it throws upon the other party the burden of proving the reality of the sale, which they have not attempted to do.

In further reply to the argument of the counsel in regard to possession following title where the parties reside in the same house, we would state that the possession of the immovable property in controversy was not in the vendor, *G. W. Emswiler*, at the time of the sale of 19th April, 1849, but was in the sheriff, as the very deed itself shows that the property was under seizure by the sheriff. It has been frequently held, that though possession accompanies the public act which transfers the property, yet, if it is under seizure by the sheriff, that there exists a legal obstacle to its delivery. 3 L. R. 183. 6 R. R. 100. C. P. 656 to 662 and 762. And where the property is similarly situated, this legal obstacle to delivery equally exists, where vendor and vendee reside in the same house, as the law will not consider that as done which cannot be done.

The court will observe in the record, an act of sale of a slave, *Minty*, purporting to be from *Williams* to *J. E. Emswiler*, plaintiff, dated just anterior to the other act. It is in proof that the slave was brought to Bastrop by *G. W. Emswiler*, was employed in his family, and taken away by him with the other negroes when he left the State; and though the title was in *J. E. Emswiler*, he manifestly exercised no ownership over the slave. This transaction was a part of the scheme of fraud and simulation, devised by the parties to defraud the creditors of *G. W. Emswiler*. The counsel seem to rely greatly upon what they assert to be the fact, that *J. E. Emswiler* was sole possessor of the property at the time of the seizure; the evidence leaves this matter in doubt, as one, if not more, of the witnesses, states that the family of *G. W. Emswiler* had not left at the time of seizure, and also stated that when the family did leave, he, *J. E. Emswiler*, left also, and went out to board. But even admitting the fact, that he was on the premises at the time the seizure was made, still we have only to reply to that, that as it admitted that *G. W. Emswiler* continued in possession of the property, acting as owner, subsequent to the sale, and was then forced out of the possession and compelled to leave the State; then it follows that as vendor abandoning the possession was not voluntary, but forced, that the possession of plaintiff remained just such after *G. W. Emswiler* left, as before he left; in other words, the character of the possession was not changed.

In regard to the personal property sued for, consisting of merchandise and household furniture, we have not intended our previous remarks to apply particularly to it, and we deem it scarcely necessary to say anything in regard to it, as there is no proof whatever that plaintiff ever purchased the goods from *J. H.*

*Emswiler & Co.*, nor has he exhibited any title whatever either to the goods or furniture, but seems to rely entirely upon his possession of said property, such as it was at the time the seizure was made. What has been said in regard to the character of his possession in regard to the immovable property, will apply with equal force in regard to the personal. It is admitted that plaintiff was clerk in the establishment up to the time of the sale spoken of; the personal property is not embraced in the act of sale, nor is any sale of the goods alleged or proven to have been made to him at that or any other time. We have no evidence of any contract, price, or of any of the requisites of a sale. He was as much in possession of the storehouse and goods before this sale of immovable property, when he was admitted to be but a clerk, as he ever was afterwards : for several of the witnesses concur in stating that he applied himself as closely to the business of the store before as after said act was passed, and they could see no change in his position, except, as one of the witnesses stated, he seemed to become better acquainted with the business. If it is true that *G. W. Emswiler* was less about the store than before, it can be easily accounted for, from the fact, that after these transactions referred to took place between the parties, the business greatly decreased, so much so, that one person could easily attend to the business. But it is expressly proven that after said act was passed, that plaintiff did not exercise sole control and management of the store, for in several instances we see that he would not make sales of goods on his own responsibility, but relied entirely on the instructions of *G. W. Emswiler*. And the testimony of *Boatner*, upon which appellant's counsel greatly rely, shows that after *G. W. Emswiler* left, the store was closed; and that prior to that time, *G. W. Emswiler* seemed to be attending to cotton speculations and making collections of debts that, it will be recollected, he had pretended to transfer to plaintiff. The claim of the plaintiff to the household furniture, which make part of the personal property, is not supported by a particle of evidence, and is evidently unfounded ; and it is not contended that he even had it in possession, until *G. W. Emswiler* was forced to abandon the dwelling in which it was.

It will be seen that the property claimed by plaintiff in this suit, together with the other property mentioned in the act of sale, which *G. W. Emswiler* took off with him when he left, embraces all the property that *G. W. Emswiler* owned or possessed, or, in other words, it was a *cessio omnium bonorum*, and that plaintiff, by being so extravagant in his pretensions, has placed himself under the necessity of proving the reality of the sale ; as this court has expressly held that a sale *omnium bonorum* is not a contract in the usual course of business, and that, when attacked, parties claiming under it are bound to establish its reality. *Scott et al v. Rusk*, 2d Ann. 266.

The judgment of the court was pronounced by

PRESTON. J.  Under executions in the suits of *Taylor* and *Rayne*, and *J. Burnside & Co.* v. *John H.* and *G. W. Emswiler*, the defendant seized four lots in the town of Bastrop, with the improvements thereon, consisting of a dwelling and storehouse, and other outhouses ; also, the furniture in the dwelling-house and a stock of merchandise in the storehouse; also, a twelve months' bond on *Chelsey Johnson*, with security for upwards of two hundred and twenty dollars, as the property of the defendants. The seizure was made on the 12th of February, 1850.

On the 6th of March, 1850, *John E. Emswiler* brought this suit against the sheriff for all the property seized, alleging that he was owner of, and in the peaceable possession of the same, until seized by the sheriff. The sheriff called the plaintiffs in the executions in warranty. They answered substantially, that the property seized belonged to the defendants in the executions, and to *G. W. Emswiler*, one of them ; that a pretended sale from *G. W. Emswiler* to the plaintiff, dated the 19th of April, 1849, was fictitious, simulated and fraudulent, and entered into for the purpose of defrauding the creditors of the defendants in execution, and particularly the plaintiffs in the executions; that *G. W. Emswiler*, the vendor, was, at the time of the sale, insolvent to the knowledge of the plaintiff; that there never was any delivery of the property purchased by the plaintiff

from the defendants in execution, or any consideration paid for the same; that all the transactions between them and the plaintiff, by which he pretended to be owner of the property seized, were simulated, and that he held it for their debtors.

We adhere to the doctrine laid down in the case of *Erwin* v. *The Bank of Kentucky*, 5th Ann. 1, that the chapter of the code regulating the revocatory action, is not applicable to cases of simulation, and that in those cases the sheriff may seize, notwithstanding the apparent transfer of the property seized by the defendant in execution. That an action is necessary to annul a real transfer of property, but for a fraudulent purpose simulation does not transfer the property at all, and it is not necessary to annul the mere paper pretence of title. Simulated transfers of property may be, for a lawful purpose, as to give credit to the vendee to enable him to raise money, or other purposes rendering the property liable to third persons, whilst it is perfectly understood between the parties, perhaps even by a counter-letter, that it remains the property of the vendor. But simulation is generally used for an unlawful purpose, and most frequently to defraud the creditors of the vendor. Fraud may, therefore, always be proved in support of the allegation of the simulated transfer of property, by those interested to establish the simulation.

We have perused, with care, the testimony in this voluminous record, and have come to the conclusion, that the property seized and sold by the sheriff, belonged to the defendants in the executions, and was held by the plaintiff, the greater part of it, for *G. W. Emswiler*, and partly for the firm.

The defendants in execution came to Bastrop in 1846, and established themselves as merchants. *G. W. Emswiler*, also practiced medicine, and appeared to have the principal means. He bought the lots in controversy, and purchased or made the improvements. He was a man of a family, lived in the dwelling-house, and owned the furniture, also three slaves, one of whom was his cook, and another a nurse. The plaintiff arrived in the country a year or two afterwards; was a nephew of the doctor, a very young man, and was employed as a clerk in the store, and it is not shown that he had any means. On the 19th of April, 1849, *George W. Emswiler* sold to him, in the night time, and at his house, though a notary public and witnesses were called, the four lots of ground, his dwelling-house and kitchen, storehouse and stable, and all other improvements, a female slave and a mortgage upon two other slaves for seven hundred and fifty dollars. The sale purported to be made for the consideration of two thousand dollars, thirteen hundred dollars of which were counted down in cash, and a note of the vendee for seven hundred dollars, payable in twelve months. The lots and houses were, at the time, under seizure at the suit of the State of Louisiana, for $750. The suit of *Burnside & Co.* was at issue, on a note for $1753, with eight per cent interest; that of *Taylor* and *Rayne* was pending; that of *Dwight* and *Trowbridge* for $1375, with interest at eight per cent from October, 1847; that of *Pinckard* and *Henderson* for $967 and interest. The lots, dwelling-house and improvements, the effects of the store and furniture were appraised at $3255. These facts alone, induce us to conclude that *G. W. Emswiler* was totally insolvent, as it is not shown that he owned any other property of consequence.

As the plaintiff claims even his furniture, and bought his house servants, and as small claims before a justice of the peace were transferred to him, we take it for granted he bought everything he had. The sale of all his property, real and personal, when in a state of total insolvency, was a transfer out of the usual course

of business, and when attacked, it became the vendee to establish its reality by evidence. *Scott* and *others* v. *Rush*, 2d Ann. 266. The plaintiff has not satisfied us by evidence that the sale was real. We do not believe that the $1300, used on the night of the sale of the real property, belonged to him. He had but recently arrived in the country; was very young; had been employed as a clerk in a very small store of his insolvent uncle, and shows, satisfactorily, no other means of purchasing everything belonging to his uncle and the mercantile firm.

It is true, that in the suit of *Pinckard* and *Henderson*, to set aside the sales, he filed his answer on the 22d of November, 1849, alleging, among other things, that when he came to the parish, a short time since, *George W. Emswiler* was indebted to him in the sum of about $3000, but he furnished no proof of the fact, and if it had been so he would have given him that debt for all his property, and not $1300 in money, and his note for $700, payable in twelve months. The evidence satisfies us that *George W. Emswiler* and his family, remained in possession of the dwelling house, servants and furniture after the pretended sale, just as before, and that the plaintiff boarded with them, and not they with the plaintiff. *George W. Emswiler* exercised the same control over the store after as before the sale. He was about removing the store from its position from one to another of the lots, and he continued to improve and beautify the premises. He exercised the same control over the small debts he purported to have transferred before a justice of the peace, after as before their transfer. He was afterwards forced to abandon the property and leave the State, on account of an indictment for perjury. The plaintiff then left the dwelling-house and went to board elsewhere. If everything had been his, he would probably have kept his house-servants, and lived at home, as before.

The fact that the vendor remained in possession of the property, and exercising control over it for six months after the sale, raised the presumption, as to third persons, that the sale was simulated, and rendered it necessary for the vendee to produce proof that they were acting in good faith, and to establish the reality of the sale. Code, article 2456. The fact that the vendor afterwards absconded from the country and left the property in the possession of the vendee, does not remove the presumption of law that the sale was simulated. It was still incumbent on the vendee to establish its reality. Even in abandoning the property, which he could not carry away from his creditors, two circumstances occurred which impeach the reality of the sale. He took with him, or caused to follow him, the servants, without any opposition from the plaintiff, who had bought one and, at least, had a mortgage upon two others to the amount of seven hundred and fifty dollars.

Another circumstance is proved to our satisfaction ; that *George W. Emswiler* endeavored, after the pretended sales, and just before he absconded, to secure the property further to himself, by artfully and unknown to the attorney, who was deceived by a fictitious letter from abroad, causing a suit to be instituted against himself, on a fictitious note, in the name of a fictitious person, intending that a false judgment should be rendered and recorded against him, so as to bind the property.

All these things appear in the record, and others corroborating the charge of simulation in the transactions between the plaintiff and the principal defendant in execution. The proof of some of these things were opposed, particularly the acts of *G. W. Emswiler* in removing the slaves from the State, and his declarations in regard to them. There is sufficient unexceptionable evidence to sustain the verdict, without considering this evidence, but we concur with the defen-

dant's counsel, that to prove simulation, which it is difficult to ferret out, great latitude must be allowed, and the party attacking the simulated sale, may show acts and conduct, of both vendor and vendee, in everything that can have the least bearing upon the sale, so as to arrive at the true intentions of the parties, and to lift the veil under which truth lies concealed.

These views, on the merits of the case, renders it unnecessary to examine the bill of exceptions to the charge of the judge, except to say, that we do not consider that he alluded to the facts further than was necessary to explain, clearly, his views as to the law. The case being against the plaintiff without the evidence, with regard to which there is a controversy, it should not be remanded.

The judgment of the district court is affirmed, with costs.