**GAYLE v. JONES et al.**
**Civ. No. 1566.**

District Court, W. D. Louisiana,
Shreveport Division.

Nov. 4, 1947.

See also D.C., 63 F.Supp. 481.

Robert G. Chandler and Turner B. Morgan, both of Shreveport, La., for plaintiff.

Jas. W. Jones, of Natchitoches, La., for Jas. Lee Jones.

Simon Herold, of Shreveport, La., for J. D. Smith.

W. W. McDonald and Albert P. Garland, both of Shreveport, La., for other defendants.

DAWKINS, District Judge.

This suit was filed July 13, 1945, by the trustee in bankruptcy of James W. Jones, Jr., against the said James W. Jones, Jr., called the bankrupt, his wife, Mrs. Elora E. Jones, his daughter, Mrs. Ernestine Cook, his adopted son, James Lee Jones, his nephew, J. D. Smith, and two corporations, Rio Hondo Land Co., Inc., called Rio Hondo, and the St. Denis Securities Co., Inc., called the St. Denis. The bankrupt filed his petition for voluntary adjudication and was adjudged a bankrupt on August 23, 1943. The principal claim against the bankrupt, the collection of which was the chief reason for bringing this action, was by the State of Louisiana for a cost bill of between $4,000 and $5,000 incurred in the proceeding for the removal of the bankrupt from the office of judge of the Tenth District of the State.

The petition alleges that the defendant corporations and another, subsequently dissolved, Central Securities and Title Co., called Central, were mere shams or dummies, created by the bankrupt and the said members of his family, for the sole purpose of hiding and concealing his property from the pursuit of his creditors. All individual defendants are charged with knowingly participating in the scheme. It

is not deemed necessary to recite at length the many transactions and circumstances alleged to support the charge. However, it is alleged that "as of March 18, 1936" the bankrupt was indebted to L. Dow Wardlaw in the sum of $110, and to Central Lumber Co. for $682.75, "which remained unpaid at the time of bankruptcy", and these with other debts, principally the cost of a proceeding for the removal of the bankrupt from office as district judge for the 10th Judicial District, composed of the parishes of Natchitoches and Red River, shown in his schedules, amounted to $4,698.03; and that the total property surrendered was listed in said schedules as of the value of $1,330, $1,000 of which was claimed as exempt, being law Books, etc., used by the bankrupt in the practice of law.

It is further alleged that some 1,800 acres of land and a lot of ground with a four-story brick building thereon, situated in the city of Natchitoches, Louisiana, was and still is the property of the bankrupt, for the reason that all the transactions, including the organization of the several corporations, conveyances of property by and to them and to the individual defendants, as detailed in the complaint, were and are mere simulations.

A joint answer was filed by the bankrupt, his wife, daughter and the Rio Hondo, denying generally the allegations of the petition and with much detail, separate answers were filed by the bankrupt as attorney appointed for the foster son and the nephew, absentees, as was also done by the St. Denis, represented by other counsel.

### The Facts.

In 1920 Central Abstract Co., Inc., called Abstract Co., was organized to make and sell abstracts of title in the Parish of Natchitoches. The bankrupt was the principal stockholder, and shares in smaller amounts were taken by other persons. It operated for a few years and became dormant, in which condition it remained for some 10 to 15 years. Its property, consisting of abstract books, furniture and fixtures, was left in the possession of the bankrupt. In October 1936, the shares of stock held by persons other than the bank-

rupt were acquired in the names of the daughter and the nephew. On October 14th of that year, Central was organized, in which the bankrupt subscribed for 150 shares of the par value of $15,000, the daughter 10 shares, $1,000, the foster son 10 shares, $1,000, and the nephew 10 shares, $1,000. The daughter and nephew each transferred their 10 shares of the Abstract Co. for their entire subscription in Central. The stock held by them in the Abstract Co., had, immediately preceding the organization of Central, been acquired from the former holders for a fraction of its face value or par value (five shares from L. N. Scarborough, par value $500, for $75 or 15¢ on the dollar). The purchase from Scarborough was negotiated by the bankrupt for the daughter. The bankrupt claims to have paid for his stock by also transferring the old shares in the Abstract Co. and conveying to Central notes payable to his own order and secured by mortgage upon his real estate consisting of some 1,400 acres of land. A check for $1,000 was issued for the stock of the foster son, who was at that time 12 years old.

On April 15, 1930 the bankrupt had given a mortgage and note of $300 as part of the purchase price of certain of these lands, and on May 10, 1935, he had executed another note and mortgage on said lands likewise payable to his own order for the sum of $1,000 due October 15, 1935, which when endorsed, became negotiable by delivery. Both of these notes remained unpaid in the fall of 1936, when he, the bankrupt, executed other notes, also payable to his own order as follows: October 24, 1936 for $10,000, due January 1, 1937; November 10, 1936 for $2,000, due March 1, 1937; and November 20, 1936 for $5,000, due November 15, 1937. Thus, within a period of less than 30 days, he had encumbered his real estate to the extent of $17,000 with notes negotiable by delivery and which, added to the two previous mortgages, made a grand total of $18,300, all of which was either past due or maturing within less than one year, the bulk of it within four months.

On November 23, 1936, Rio Hondo was organized. Its stock was issued as follows: To the bankrupt 30 shares, par value $3,-

000; to the daughter, foster son and nephew, one share each of the par value of $100; and one share to J. G. Gibbs, attorney. On December 30, 1936, the bankrupt executed a deed to Rio Hondo, covering all his real estate, for the recited consideration of $1,200 in cash and the assumption of the five mortgage notes, above described, beginning with the first of $300, dated April 5, 1930, down to and including the last of $5,000, dated November 20, 1936.

At the time of these corporate transactions and transfers, the bankrupt owed debts and was engaged in litigation as follows: (1) he was being sued by the Shreveport Long Leaf Lumber Co. on a note for $2,184.32, dated December 22, 1932, bearing interest of 8 per cent and attorneys' fees. This suit had first been filed on the 8th day of January, 1935, but service thereon was not accepted by the bankrupt until November 18, 1935.

The papers in this suit disappeared from the office of the clerk of the court, of which bankrupt was judge, and on February 19, 1936, plaintiff therein filed a petition setting forth this fact, took a non-suit and entered a new action. The bankrupt filed his answer to this second suit November 20, 1936, the same day that he executed the last mortgage for $5,000. Notwithstanding the fact that he had asked for and been given extensions on the Lumber Co. note, he alleged, under oath, that he had "at no time owed Shreveport Long Leaf Lumber Co. any amount * * * and the note was signed through error and without any consideration whatsoever * * *".

When the case was finally tried plaintiff introduced the note in evidence, and the bankrupt offered no defense whatever. There was judgment for the plaintiff as prayed for, but the bankrupt took a suspensive appeal. In order to do so, he was required to give a bond for one and a half times the amount of the judgment with interest conditioned to pay the judgment, if affirmed. This bond was for the sum of $4,782. The surety on the appeal bond was John Williams, who swore that he owned property sufficient to satisfy this amount over and above his lawful exemptions. The bankrupt also made affidavit to the same effect. The judgment was affirmed

and rehearing denied by the Supreme Court of Louisiana on November 29, 1937. See Shreveport Long Leaf Lumber Co. v. Jones, 188 La. 519, 177 So. 593. In the subsequent proceedings for the judicial removal of the bankrupt as judge for the 10th Judicial District Court, Williams swore that at the time he signed this bond the only property he owned consisted of two horses and four cows worth about $350. See Stanley v. Jones, 201 La. 549, 9 So. 678.

(2) A suit was pending by L. Dow Wardlaw against the bankrupt, also in the 10th District Court for Natchitoches Parish in the sum of $110, and judgment in favor of the plaintiff therein was rendered on April 29, 1937, and has never been paid.

(3) There was in the record of the same court an unpaid judgment in favor of C. R. Scott against the bankrupt for the sum of $194.18, rendered August 22, 1934.

(4) A suit by Central Lumber Co. against bankrupt for $682.75, filed in 1934, which according to D. S. Williams, liquidator of this company, had gone to the Court of Appeals for the Second Circuit, and was still pending when the present suit was tried, because this record had also disappeared from the office of the Clerk. However, the litigation was of a different nature. See 184 So. 565 and 15 So.2d 232.

The land sold by the bankrupt to the Rio Hondo on December 30th, some three days after the hearing of the judgment in favor of the Shreveport Long Leaf Lumber Co. on January 2, 1937, consisted of some 1,400 acres. Thereafter there were acquired in its own name some 400 acres of land additional, and on October 12, 1940, Rio Hondo executed a deed to Central for the whole 1,800 acres. The recited consideration of $18,093 was the transfer to and cancellation by Rio Hondo of the following mortgage notes, which the latter corporation has assumed in the sale to it by the bankrupt, to wit: (1) the note for $10,000, which, with accrued interest, was recited as amounting to $13,200, due since January 1, 1937; (2) the note for $2,000 (amount of interest due not stated), dated November 10, 1936 and due March 1, 1937; and (3) the sum of $2,400 "advanced by the pur-

chaser", Central "to pay that certain note and mortgage held by Rio Hondo in the sale from James W. Jones, Jr." to it, above described. This made a total of $17,600 but there is no showing in the deed as to what made up the balance of $493 of the total consideration, to make the figure of $18,093.

On the 15th day of October 1936, the widow and heirs of Henry A. Cook executed a deed to Central for a lot of ground in the city of Natchitoches, Louisiana, at the northwest corner of St. Denis and Third Streets, having a width of 66 feet and a depth of 133 feet, (upon which the brick building was subsequently constructed) for the recited consideration of $2,750 cash.

On October 30, 1940, the bankrupt, his daughter, foster son and nephew signed a declaration to the effect that they were "the sole and only stockholders of" Central, in the amount of 175 shares belonging to the daughter, 10 shares each to the foster son and nephew and 5 shares to the bankrupt respectively, and that they had unanimously agreed "that this corporation be voluntarily liquidated out of court". With the same unanimity they appointed the bankrupt "liquidator" to "conduct the winding up of affairs of the corporation" and declared that it "owed no obligations, save and except whatever sum may be incurred as expenses in the liquidation of its affairs"; that its assets consisted of $500 in cash, certain real estate and personal property. It was further provided that the liquidator should pay himself $500 in cash for his stock. As to the other stockholders the document recited as follows:

"All of the remaining property, both real and personal, (except the corporate funds above described and distributed) shall be transferred, under proper deed of conveyance, by the liquidator to the remaining shareholders, in indivision, in fee simple ownership, in the following proportions, to-wit:

| | |
|---|---|
| "Mrs. Ernestine Cook | 175/195 |
| "James Lee Jones | 10/195 |
| "J. D. Smith | 10/195" |

Pursuant to this authority, the bankrupt executed a deed conveying to the parties named, the property of the corporation in indivision in the proportions stated. Both the date and month in the deed were left blank but it was recorded in the conveyance office of Natchitoches Parish on November 2, 1940.

On the "——— day of April, A.D. Nineteen Hundred and Forty One", the nephew, J. D. Smith, and foster son, James Lee Jones, executed in favor of the daughter, Mrs. Cook, a single document conveying "Each, their 10/195ths (a total of 20/195ths)" undivided interest in the property, which the bankrupt had transferred to them as liquidator of the Central, and this act was also recorded on November 2, 1940. The consideration recited as having been paid by Mrs. Cook was a total of $1,000. In this connection, it is well to call attention to the fact that in the conveyance of the property to Mrs. Cook, James Lee Jones and J. D. Smith on the "——— day of ——— 1940" it was declared that they owned the capital stock of Central as follows: "Mrs. Ernestine Cook, 175 shares, James Lee Jones, 10 shares, J. D. Smith, 10 shares", and that the par value of said stock when issued was $100 per share. On this basis Mrs. Cook's interest would have been $17,500 and those of the foster son and nephew $1,000 each. At the price stated in the sale, however, to Mrs. Cook, there was a depreciation of about 50 per cent, in view of the fact that it was represented that the bankrupt had been paid $500 for his five shares.

Under date of "July ———, 1943", some 21 months later the daughter signed a conveyance to her foster brother of an undivided one-half interest in the land and town property for the recited consideration of $5,000 "cash and other considerations"; the last three quoted words from a photostatic copy attached to the complaint appear to have been added after the document was written.

This document purports to have been signed by Mrs. Cook, the daughter, in the Parish of Ouachita, in the presence of a notary, for Natchitoches Parish and two witnesses on a day in July, 1943, which also cannot be made out from the photostatic copy, and to have been signed by the

foster son on a day in August, 1943, which likewise cannot be deciphered, in the presence of two other witnesses, whereas on both dates it was clearly shown that the foster son was still in the Navy in the Pacific theatre of war, and did not return to the States until about the middle of December, 1943.

On December 27, 1943, St. Denis was organized with an authorized capital stock of $50,000, consisting of 500 shares of the par value of $100. 245 shares of $24,500 was subscribed for by each the daughter and foster son, and five shares or $500 each by the bankrupt and his wife. The bankrupt was named as president, the foster son, vice-president, and the daughter as secretary-treasurer. On the same date the daughter and foster son executed deeds conveying all the real estate to St. Denis, together with the following personal property:

"The entire data of abstract records, formally belonging to the Central Abstract Co. Inc., together with Iron Safe and Furniture and Fixtures.

"All the furniture and household fixtures on the second, third and fourth floors of the Brick Veneer Building, together with Iron Safe formally belonging to the Central Securities and Title Co. Inc. Also a 190 Chevrolet Automobile, Engine No. 2,912,130 Four Door Sedan."

The consideration for the property recited in each of the deeds from the daughter and foster son was 230 shares of the capital stock of St. Denis "valued at the amount of Twenty Three Thousand Dollars ($23,000) * * * fully paid and designated as paid up capital stock * * the value of said property fixed by the Board of Directors * * *, and $1500 in cash." Both deeds were accepted for the St. Denis "by James W. Jones, Jr." (the bankrupt was president). Attached thereto was a copy of a resolution of the Board of Directors declaring that "at least seventy five per cent (75%) of the stock subscribed should be paid for". On this basis Mrs. Cook and James Lee Jones were required to pay, either in property or in cash, the sum of $17,250 (75 per cent of $23,000). On the face of the record this

was done by each transferring his undivided one-half interest of the property described in the respective deeds on December 27, 1943; whereas some five months preceeding, Mrs. Cook had sold to her foster brother her one-half interest for the $5,000 cash "and other valuable considerations" by a deed purporting to have been accepted by him in August 1943, when he was overseas.

As the result of these several transactions, in the course of approximately seven years, the major interests which the bankrupt owned, first in the properties and secondly in the stocks of the corporations, consisting of some 1,400 acres of farm land with improvements, his 3/5ths of the stock of the old Abstract Co., some $17,000 of stock in Central, and all but the qualifying shares in Rio Hondo Co., had passed out of the bankrupt and he was left with only five shares of the stock in St. Denis, but all of which, notwithstanding, he became the president and manager. He and his family have been living in the brick building on the lot in the city of Natchitoches continuously since, and the bankrupt has maintained his law office therein, without paying any rent. No dividends have ever been paid on the stock of any of the three corporations.

### Mrs. Cook's Investments.

Mrs. Cook, the daughter, claims to have invested for the purchase of stock, payment of taxes, etc, in these corporations the sum of $15,000 in cash. Except for some $300 claimed to have been earned otherwise, all Mrs. Cook's individual income came from teaching school. Statements were furnished and filed in evidence in this case by the "secretary of the State Teachers' Retirement System of Louisiana", running back to 1921 for her husband and to 1937 for the wife, showing the payments and the periods in which each taught, respectively, during that time. They disclosed that Mr. Cook had taught continuously from September 1921 to the end of the school year 1945-46, except for the years 1922-23, 28 and 34, in the parishes of St. Bernard, Rapides, Natchitoches, Vermilion, Red River and Ouachita. The only record furnished of Mrs. Cook's teaching

268

began with the school year 1937-38 and continued down to 1945-46. Her net earnings for that period were:

from 1936, in the fall of which year Mrs. Cook is represented as having begun her investments, through the entire school year

| "Parish | Year | Earnable Compensation | Salary Deductions | Interest | Balance at end of Year |
|---|---|---|---|---|---|
| Ouachita Parish Sch. Bd. | 1937–38 | 810.00 | 32.40 | .00 | 32.40 |
| " " " " | 1938–39 | 829.98 | 33.20 | 1.30 | 66.90 |
| " " " " | 1939–40 | 859.95 | 34.40 | 2.68 | 103.98 |
| " " " " | 1940–41 | 859.95 | 34.40 | 4.16 | 142.54 |
| " " " " | 1941–42 | 900.00 | 36.00 | 5.70 | 184.24 |
| " " " " | 1942–43 | 954.00 | 38.16 | 7.37 | 229.77 |
| " " " " | 1943–44 | 1198.83 | 47.96 | 9.19 | 286.92 |
| " " " " | 1944–45 | 1282.50 | 51.30 | 11.48 | 349.70 |
| " " " " | 1945–46 | 1450.00 | 58.00 | 13.99 | 421.69" |

The earnings of Mr. Cook from teaching were as follows:

| | Mo. Rate of Salary. | From Mo. | From Year | To Mo. | To Year | Length of Service Yrs. | Length of Service Mos. |
|---|---|---|---|---|---|---|---|
| "St. Bernard Parish Sch. Bd. | 140 | Sept. | 1921 | Feb. | 1923 | 1 | 6 |
| Rapides " " " | 80 | Oct. | 1924 | Apr. | 1925 | | 7 |
| " " " " | 85 | Sept. | 1926 | June | 1927 | | 9 |
| " " " " | 100 | Sept. | 1927 | June | 1928 | | 9 |
| Natchitoches " " " | 115 | Sept. | 1929 | May | 1930 | | 9 |
| Vermilion " " " | 115 | Sept. | 1930 | June | 1931 | | 9 |
| Red River " " " | 200 | Sept. | 1931 | Apr. | 1932 | 1 | |
| " " " " | 135 | Sept. | 1932 | May | 1933 | 1 | |
| " " " " | 125 | Sept. | 1933 | June | 1935 | 2 | |
| Ouachita " " " | 115 | Sept. | 1935 | Aug. | 1936 | 1 | |

| | Fiscal Year | Earnable Compensation | Salary Deductions | Int. | Balance at end of Year. |
|---|---|---|---|---|---|
| "Ouachita Parish School Board | 1936–37 | 1250.00 | 50.00 | | 50.00 |
| " " " " | 1937–38 | 1155.78 | 46.23 | 2.00 | 98.23 |
| " " " " | 1938–39 | 1155.78 | 46.23 | 3.93 | 148.39 |
| " " " " | 1939–40 | 1204.92 | 48.20 | 5.94 | 202.53 |
| " " " " | 1940–41 | 1305.00 | 52.20 | 8.10 | 262.83 |
| " " " " | 1941–42 | 1589.94 | 63.60 | 10.51 | 336.94 |
| " " " " | 1942–43 | 1685.34 | 67.41 | 13.48 | 417.83 |
| " " " " | 1943–44 | 1952.60 | 78.10 | 16.71 | 512.64 |
| " " " " | 1944–45 | 2025.00 | 81.00 | 20.51 | 614.15 |
| " " " " | 1945–46 | 694.38 | 27.78 | .00 | 641.93 |
| Feb. 1, 1946 Contributions returned | | | 641.93 | | .00" |

It thus appears that the total net earnings from teaching of both husband and wife of 1943-44, some eight years, were for Mr. Cook, $12,815.96 and for Mrs. Cook, $8,779,

making a total of $21,595.35 after deductions, or at the rate of $2,699.40 per year for the two.

Mr. and Mrs. Cook were married in 1926, and their first child was born in 1928, the second in 1930, and the third in 1932. By the end of 1936, the year in which these investments were supposed to have been started, these children were each 8, 6 and 4 years old respectively, and by 1943, when St. Denis was organized, and the value of the investments had climbed to $23,000, the children were 15, 13 and 11. During this period of eight years there was added to the necessary expenses of the husband and wife the cost of feeding, clothing, medical bills, etc and caretaking for the smaller children while the mother was in the school room. The family also purchased and operated an automobile, paid insurance and such taxes as were assessed against them. They also had to pay rent, utility bills, grocery bills, and other expenses of maintaining the family of five. The profession of school teaching requires a higher standard of living in the way of clothes worn by the family, etc., than would have been necessary for ordinary laboring people, yet Mrs. Cook swore that the entire expenses of the family did not exceed $50 per month.

The first income tax return made to the Federal Government by either spouse was for 1940, jointly by husband and wife, and showed a gross amount of $2,384.15, which was less than the average from teaching above noted. $2,094.75 of this was from Ouachita Parish School Board", where they lived and were teaching, $228 from "Louisiana State Normal College", $29 from "a building contractor" and $30 from a paint job for the same contractor. Nothing was shown for keeping books as was claimed in Mrs. Cook's testimony. Among deduction taken was an item of interest amounting to $280, of which $30 was paid to "People's Bank, Chatham, Louisiana," and two items to "Three-Way Finance Co., Monroe, Louisiana", of $100 and $150, respectively. Notice can be taken of the fact that Chatham is in Jackson Parish, a considerable distance from Natchitoches, Louisiana, where the People's Bank"

with which it is shown the defendant did other business, is situated.

Income tax returns were also made jointly for the succeeding years of 1941, 1942, 1943, 1944 and 1945. That for 1941 was made on a Form 1040 A, which did not show deductions for interest, but those for the following four years showed interest paid as follows: 1942, (to whom paid not shown) $413.75; 1943, to "bank $24.70, Finance Loan companies, $420.92", total $447.62; 1944, "People's Homestead $68, bank $70, loan companies $420.85 or a total of $578.85", and for 1945, $718.60, all of which was paid to Finance companies except $98.57 paid to People's Homestead, $27.34 to People's Bank, presumably of Chatham, Louisiana.

The Three-Way Finance Co. of Monroe is a small loan concern which is permitted to charge high rates of interest, the maximum of which was limited prior to 1940 to 43 per cent per annum. The claimed investments by Mrs. Cook in the several corporations, including the stock allegedly purchased from her father, the bankrupt, had all been made before the Central was dissolved in 1940, but no dividends or revenue therefrom had been received by Mrs. Cook. If her contention as to investments is accepted, it must be done in the face of the fact that the family was borrowing money from small loan companies at very high rates of interest and also from a bank for presumably no more than the conventional rate of 8 per cent fixed by law. No explanation was made as to why or for what reason borrowing of this kind became necessary, if Mrs. Cook and her husband had accumulated such large savings from teaching, ordinary self-interest, it would seem, would have induced them to use these funds to discharge such burdensome obligations before making investments from which they received no return over a long period of years and in which they exercised little or no control nor had any reason to believe great profits would be made. It simply taxes credulity too far to ask a court to believe that the modest circumstances of this little family permitted it to make the very large investments of some $15,000 out of teaching and the small amount earned by the husband in summer,

over a period of 8 years, where the teaching produced a little over $2,000. The testimony of Mrs. Cook is very vague and she is able to give little or no detail where those matters are important. On the other hand, the bankrupt tries to supply this deficiency. There are the further circumstances that over long periods of time, bank accounts were not maintained, or in small amounts, but when it was necessary to make records of transactions of large amounts to show investments, cash was deposited and usually withdrawn on the same day and in the exact amounts needed. It was also testified by the bankrupt and other members of the family that large sums of money were kept by them in the safe in his office, notwithstanding he and some of them, did, from time to time, keep bank accounts in the three banks in Natchitoches, in amounts, which ordinarily would be expected of people in their apparent circumstances. In response to inquiries on this point by the court it was stated that they considered the money just as secure in the iron safe in the bankrupt's office as in the banks, but the attempted explanation as to why this was done as to some funds while depositing others in bank was not clear, to say the least.

### Investments of James Lee Jones.

There was no conclusive proof of the adoption of James Lee Jones by the bankrupt and his wife, although they raised him from a very tender age. He was emancipated when 18 years of age. The bankrupt testified that this defendant inherited from his blood mother and father some $1,000, which had been invested in Government bonds, and that these were sold, the proceeds deposited in bank and promptly withdrawn to make his original investments in Central, and that the bankrupt gave James Lee Jones another $1,000. This, of course, took place during the time the bankrupt was placing his title to his property in the corporations and while he was engaged in the litigation with his creditors, described above. No copies of succession proceedings, if the parents were dead, or statements from them, if living were furnished to support the testimony of the bankrupt and the foster son. He

was, as heretofore stated, only 12 years of age when the deposit of $1,000 was made and withdrawn to make the investment. By the time St. Denis was organized, Dec. 27, 1943, he had become the owner of a half interest, valued at nearly $24,000, in the property, from resources consisting of the claimed inheritance of $1,000 and the donation by the bankrupt of $1,000, made sometime in "1933 or 1934," his wages as a seaman while in the Navy, and from profits on war souvenirs, which he recovered in the Pacific Islands, after their occupation by American troops.

James Lee Jones enlisted in the Navy on August 8, 1941, and was finally separated from the service in October 1946. At the beginning his salary was $21 per month but it was later increased to $36, then to $54, $66, $77, but finally reduced back to $66 per month, at which figure it continued through the fourth quarter of 1944. Beginning December 7, 1942, he was paid additionally for sea and foreign service duty $4.70 per month, which was increased June 1, 1943, to $10.80, where it remained for the balance of the overseas service. During the period he claims to have made his principal investments in the corporations and properties involved here, according to a statement furnished by this young man and filed in this case, from the date of his enlistment in August 1941 to March 1945, the crucial period, he earned from his pay in the Navy a total of $2,808. Thus, if he had saved every penny, this would have been just about one-half of the sum of $5,000 named in the purchase from his foster sister, Mrs. Cook, in July 1943, for the one-half interest in all the property formerly owned by the bankrupt, plus the 400 acres acquired by Rio Hondo and the lot with the apartment building on it in the city of Natchitoches, to say nothing of the "and other considerations", which quoted words appear from the photostatic copy of the document to have been added. If we take his own figures of his earnings to the end of 1943 only, they amount to $1,752. For the entire period of service from August 1941 to October 1946, inclusive, "flight pay for approx. 7 months, $273," "20 per month for commuted rations from June 1945 to April 1946, $200," and

"muster out pay $300", the total would amount to $5,385. From March 1, 1944, through August 1946, the bankrupt received allotments from this defendant of $40 per month.

James Lee Jones attempted to account for the major portion of these investments by the claim that the funds came from profits made in the sale of trophies, such as pistols, guns, helmets, etc., left behind by the Japanese on the battlefields and which he had recovered. He testified that the total consideration agreed to be paid for the one-half interest in the property which he bought from Mrs. Cook by deed dated in July 1943, and purporting to have been accepted by him in August of that year, was $15,000, of which $2,000 was paid in cash through his mother, and that he "brought home $5000, December '43 and paid my sister that in cash", making $7,000 paid by the end of that year. He further states that "about $2000 or $2200 was paid from December 1943 until I got back out of the navy in October '46. $1000 of that my dad gave me as educational money in 1933–1934", and that at the time of giving his testimony in this case, in November 1946, he still owed his sister a balance of "approximately $6000." Thus, from his entire earnings in the Navy and what he made in recovering and selling Japanese war trophies and equipment, plus $1,000 given him by the bankrupt, "in 1933 or 1934" he has paid Mrs. Cook over $9,000. He says also he gave his mother a present of $200. Being pressed for an estimate, he stated that he sold from 30 to 35 rifles at $135 apiece or less, as well as "helmets and other things". When asked where he got them he said, "we picked them up from the Japs when you killed them or when you cleaned up the battle area", and that "I was with the amphibious and detached with the Second Marine Division, Second Regiment on Guadalcanal. We got money various ways." He said he was on Guadalcanal in August 1943, received and signed the deed from his sister to himself which was witnessed "by my officer out there at that time", whose name was "Sigler". The document, as appears from the photostatic copy was witnessed by two witnesses, the second of whom appears to be "Powell" but the first, although it cannot be made out clearly, has no resemblance to "Sigler" and appears to end with the letters "en". While neither the day in July when the sister signed, nor the day in August, when James Lee accepted this deed, as he says, on Guadalcanal, can be deciphered, it was recorded in the Recorder's Office August 28, 1943, a remarkably short time under the circumstances. When asked how he paid for his stock in St. Denis, which was organized on the 27th day of December, 1943, he said, "I had sent a lot of money off and on home through the mail and had sent about $1700 out of all that time and when I got back to the States in December of 1943, I gave my mother $200 as a Christmas present and the other $1500 in cash into the company for my undivided one-half interest in the land, formerly owned by my sister." It will be recalled that he had previously stated he had paid $2,000 when the deed to him by his sister of the one-half interest was signed and that he brought home with him in December 1943 $5,000. Although in most instances, where it is important to make a record of transactions in these matters, funds were deposited and immediately withdrawn by check, in these two, where, the document purported to show payment of $5,000 in July or August 1943 (which he stated on the stand was $2,000) and the other $5,000, which he brought home in December, there is no proof save his own word and that of the bankrupt with some rather inconclusive statements of his mother in circumstances where it is utterly impossible to contradict them by any record.

He further states that his father, the bankrupt, "is the manager of that corporation" (St. Denis), collects the rents and while "they have declared dividends, they have not given any out". Neither he nor his sister knew anything about the financial affairs of any of the corporations.

This defendant testified first that the "Hornet" to which he was assigned, "was sunk in January 1942", but later said they had picked up the Doolittle raiders on April 2 of that year, and finally stated "it was sunk in the battle of Santa Cruz in October 1942". Hence, it must have been after

272

this time that he went with the amphibious marines and took up duty for the first time on Guadalcanal. The exact date of the fighting on Guadalcanal was not shown but it had ended when one F. R. Davis landed there on February 28, 1943. He later testified that, according to his best recollection "the final date for the end of the battle on Guadalcanal was February 7, 1943." Davis served as mail clerk for the army until October 10, 1943. He said that there was "not any considerable amount of traffic in war trophies compared to the later islands I was on." At the end of his stay on the island the tide of war in the Pacific "was just beginning to turn in our favor then." During the time he was there sufficient merchant vessels came to the islands to supply the needs of the service. After capturing Guadalcanal the forces moved on to New Georgia either "late in June or early July". It was his experience that the arms of the Japanese were taken largely "by the troops which were first there, which was the infantry."

When an attempt was made to have the foster mother affirm statements as to money sent her by this defendant, she, as a witness for defendant, on direct examination, testified "the boy sent me money when he was out in the Pacific. He gave me $200 and I used that (to buy stock in St. Denis) and then we made a note to the St. Denis Securities Co. for $300, and this year, January, I believe was some time the early part of the year 1946, we borrowed some money from the Exchange Bank to pay that note." Being asked how much money he (her foster son) had sent her in the Pacific she could only remember specifically the $200, although on further questioning she said, "well, he sent me money orders then; yes, sir; but I know he gave me that much in the St. Denis Securities Co. I put that much in the company." Finally she was asked "Did he send you any money other than the $200 for you to keep for him?" "She replied, "Well, I remember that he sent me some on Mother's Day and I kept money for him while he was away." She was excused from the stand and defendant, James Lee Jones, was called for further examination. Later she was recalled by defendants, after having engaged in con-

versation with her husband for some time. She was then questioned by the latter in a series of leading questions, not objected to by counsel for plaintiff, one of which was, "Well, now, did he send money from 1941, 1942 and 1943 to you?" The answer, "He did." Being asked, "How much did he send?" replied "$1700"; which was "put in the company." Finally the testimony became so obviously statements by the questioner merely approved by the witness, that the Court intervened and put a stop to it. She was then asked how much he sent her "between January 1942 and December 1944 from the southwest Pacific" and replied "$1700. I figured that all out already."

Mrs. Jones had been first called on cross examination by the plaintiff only a short time before on the same day and had stated that her son had "sent back money orders. I could not tell you how much exactly * * * He sent some to me and he sent some to be paid into the company."

Mrs. Cook in her testimony did not attempt to corroborate her foster brother as to where these funds came from, although she did say he had paid her the amounts claimed, but when her testimony is carefully analyzed it is certain that she knew practically nothing of the details going on through all these transactions. In fact, when called to give testimony on cross examination at Monroe to have her explain how she had saved such large sums of money from the meagre earnings of herself and her husband, before signing the deposition she wrote above her signature in her own handwriting, "I sign this under protest."

In view of the surrounding circumstances, the relations of the parties, etc., the burden was shifted to the son and daughter to prove their investments in these properties, and it is the conclusion that both have failed to do so.

Attorney Gibbs was represented as having taken one share of $100 in one of these companies, but there was no effort to prove by him that he had made such an investment.

The nephew, J. D. Smith, was shown at the time of the rapid transfers and mort-

gaging of the bankrupt's property, just before the judgment in the Shreveport Long Leaf Lumber Company was rendered on January 2, 1937, to have been an employee in a filling station on a small salary of about $100 per month and with no other means to make investments.

The bankrupt claims that he had livestock and farming implements on the farm of 1,400 acres, which he placed in the name of Rio Hondo, more than sufficient to pay what he owed at that time, but these were immovables by destination under the Louisiana law, and were affected by the many mortgages which he had executed. Louisiana Civil Code, art. 468; Maginnis v. Union Oil Co., 47 La.Ann. 1489, 18 So. 459; Alliance Trust Co., Ltd. v. Gueydan Bank, 162 La. 1062, 111 So. 421. Further, it is not shown that any of the creditors had knowledge of this livestock or farming implements, and besides, they were being held at bay by the delaying tactics and litigation heretofore described. In fact the mortgage for $10,000 executed by the bankrupt on October 24, 1936 declared that "he does chattel mortgage and hypothecate the following described livestock, situated on the lands" mortgaged, (describing cattle only) on the same property, which on December 30, 1936, following, he transferred to Rio Hondo. And according to his own testimony, he had transferred this note before the end of 1936, along with others to Central for its stock.

There are many other circumstances tending to dispute the contention of the bankrupt that the several mortgage notes were negotiated or held by other persons for bona fide obligations or transactions. This is particularly true of the note for $5,000, which he testified had been held for several years by a Mr. Levy for a personal loan. Mr. Levy was dead when this case was tried, but his personal attorney who had always been consulted in such matters knew nothing of this claim of a personal loan of such magnitude. Neither did the records of Levy's estate or of the bank show any evidence of it. In 1939, Levy gave to his attorney a memorandum furnished by the bankrupt in the latter's own handwriting, to be used in preparing a special mortgage of $2,500 for Levy's bank on some of this same property previously transferred to Rio Hondo. It showed this mortgage note for $5,000 to be held by Central. The transaction for which the memorandum was furnished was never completed, and Levy died in March 1940.

As proof that the bankrupt continued to own and control all the property, notwithstanding organization of corporations and the transfers to them and to members of his family, plaintiff offered more than 100 checks of these companies drawn by the bankrupt to pay lodge dues, drug bills, hotel bills, grocery bills, filling stations, barber shops, etc. Also, photostatic copies of the bankrupt's account with the Exchange Bank, as shown by its liability or note ledger, covering loans made to him. They revealed that the Central Securities and Title Co., beginning in 1937 and continuing on through 1938, 1939, 1940 and 1941, either endorsed the bankrupt's notes or had its stock put up as collateral. Along with these endorsements or collateral of the corporations, there was pledged "U. S. Govt. Rental Pledge" arising from compliance with the restrictions placed by the government on the acreage planted in certain crops on farm lands, which had previously been transferred to Rio Hondo on December 30, 1936.

The bankrupt testified that Central was organized in order to have a corporation which could own, operate and deal in real property, in addition to the abstract business conducted by the Central Abstract Co. However, there was little or no subsequent operation as to abstracts, and when practically all the real estate and assets of the bankrupt, including stock of the Central and Rio Hondo had found their way into the apparent ownership of his daughter, foster son and nephew, Central was dissolved and liquidated, leaving the bankrupt with only $500 in cash, according to the written documents covering these matters. Yet, about the time the bankrupt was judicially removed from office as judge, and the large cost bill, which is the principal reason for this suit, had been or was about to be assessed against him, he went into bankruptcy, and shortly thereafter, the last corporation, St. Denis was organized on December 27, 1943. Nothing convincing

was offered to explain why, in 1940, it was to the advantage of the daughter, the then principal stockholder (who was shown to own 175/195ths of the stock in Central while the foster son and nephew each held 10/195ths), the foster son and nephew to place this property, including farming lands of 1,800 acres with improvements and appurtenances thereon, and the apartment building in the city of Natchitoches, in their individual names; and shortly thereafter for the foster son and nephew to transfer to the daughter their interests for about 50¢ on the dollar; nor why in the summer of 1943, when the litigation in the Supreme Court was approaching a culmination, it was decided the daughter should transfer to her foster brother, then overseas, one-half of the entire property. The reason given for the last transfer was simply the desire of the foster son to make a good investment. This was followed four months later by the organization of the St. Denis. All this served to mix up and complicate matters in a manner to make it difficult to unravel.

█ If, as contended by the plaintiff, the several mortgages were executed, the corporations organized, and the transactions in the names of the bankrupt's family, were merely for the purpose of hiding his property from his creditors, the fact that they did include some, which, as to innocent third persons, were binding, would not serve to make them real, either as to prior existing creditors, or against those, who subsequently became such. Emswiler v. Burham, 6 La.Ann. 710. At page 716 of 6 La.Ann., the Court in that case said: "Simulated transfers of property may be, for a lawful purpose, as to give credit to the vendee to enable him to raise money or other purposes rendering the property liable to third persons, whilst it is perfectly understood between the parties, perhaps even by a counter-letter, that it remains the property of the vendor. But simulation is generally used for an unlawful purpose, and most frequently to defraud the creditors of the vendor. Fraud may, therefore, always be proved in support of the allegation of the simulated transfer of property, by those interested to establish the simulation."

The entities and individuals used would simply be the bankrupt under other names.

█ The bankrupt has introduced a mass of evidence and exhibits showing the acts of himself and members of his family as well as records in books of account, especially where they tend to support his contention; but these cannot serve to create reality, if none existed from the beginning. The evidence strongly preponderates in favor of the view that other members of the family simply carried out the wishes of the bankrupt and that he, at all times, continued as the real possessor, owner, and operator of the properties, and was the sole beneficiary of what was done. It is the considered opinion of this court, that, except for the first two mortgages, for $300 and $1,000 respectively, executed by the bankrupt, all mortgages, corporate organizations and transactions, as well as the deeds and transfers by and between members of the bankrupt's family were mere simulations and may be ignored; and further, that the property involved herein should be brought into and administered as part of the bankrupt's estate. The right to attack a simulation never prescribes. Lawson v. McBride, 121 La. 282, 46 So. 312; Schalaida v. Gonzales, 174 La. 907, 142 So. 123; Decuir v. Veazey, 8 La.Ann. 453; Nor is it necessary to prove insolvency at the time the transfers took place. Chapman v. Irwin, 157 La. 920, 103 So. 263.

█ The following are badges of fraud and simulation: Transfers to a family corporation, in the face of existing debts for its capital stock, Price v. Florsheim, 174 La. 945, 142 So. 135; Lindstrom v. Sauer, La.App. Orleans, 166 So. 636. Inadequacy or fictitiousness of purchase price, Vol. 37, C.J.S., Fraudulent Conveyances, § 81; Transfers pending suit, Dallas Brewing Co. v. Holzner, 116 La. 719, 41 So. 48; Where the vendor retains possession, Radovich v. Jenkins, 123 La. 355, 48 So. 988; Goothye v. Delatour, 111 La.Ann. 766, 35 So. 896; Relationship of the parties, Cadiere v. Gaidry, 42 La.Ann. 169, 7 So. 232; Friedlander v. Brooks, 35 La. Ann. 741; American Nat. Bank v. Viterbo and Bros., 46 La.Ann. 1313, 16 So. 199; Pruyn v. Young, 51 La.Ann. 320, 25 So.

125; the transfer of all or practically all of his property by one financially embarrassed, Gregg v. Lee, 37 La.Ann. 164; Emswiler v. Burham, 6 La.Ann. 710; and, concurrence of several badges of fraud make a strong case, Sansone v. Brady, 6 Orleans App., La., 166. Where a large number of badges of fraud exist, the burden is shifted to the one relying on such transactions. First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155; King v. Atkins, 33 La.Ann. 1057.

Proper decree should be presented.