by Elmore to his wife a few months before he obtained the judgment of divorce.

It is true that another of these letters (perhaps two), it is stated, was received a few months after the death of Elmore.

As relates to this fact, the contention of defendant is that plaintiff has destroyed her case by the production of letters, admitted as being in the handwriting of Elmore, received by her in 1905, bearing the postmark, to wit, February 13, 1905.

We have found no letter of that date, only envelopes produced by plaintiff at the instance of defendant on her motion to have them produced in the suit; but no letters remained, as we infer. The witness does state that the envelopes contained letters which were received about the time indicated by the postmark. Nothing was said of any moment in regard to the letters (referring to the last letters) contained.

These envelopes are not fatal to plaintiff's claim. Letters may have reached Alexandria some little time after the death of the writer.

Be that as it may, the witnesses before named have identified a number of the letters, and they all appear to have been written from the city of New Orleans by the husband. The postmark on the envelope is not very evident as to the year. We are not inclined to the thought, however, that the year is other than 1905; but, even if received at that date, it would not do away with the corresponding effect of a number of letters of a prior date, supported by disinterested witnesses, who testified that they were received by plaintiff, and that they bore the name of plaintiff's husband.

From the evidence we must hold that the witness never left the state. If she had left home, and had become an absentee, it was incumbent upon the plaintiff in the first suit, or the defendants in the present suit, to so allege and prove. She could only be represented by a curator ad hoc, if she was an absentee. She was not a fugitive from justice, nor an absentee, essentials for such an appointment.

The appointment of a curator ad hoc is jurisdictional. Young v. Upshur et als., 42 La. Ann. 362, 7 South. 557, 21 Am. St. Rep. 381.

It follows that there can be no legal judgment rendered contradictorily with the curator ad hoc; for, unless there was proper showing made, the court had no jurisdiction to render such a judgment.

That which in our opinion refers to the curator is not controlling, as it was presented by plaintiff in the alternative; and the court decides the first proposition for appellee.

The defendant in this suit has interposed the prescription of 12 months. Because of want of citation that prescription cannot be of any avail in this suit; for, as the court was without jurisdiction to render the judgment, it was absolutely null.

Our learned brother before whom the case for a divorce was heard, and who rendered a judgment of divorce, presided over the court that rendered a judgment annulling the first decree. He, without the best of reasons, would not have annulled his first decree, whether on the ground before discussed, or other grounds alleged in this suit, which we have not deemed necessary to discuss, for the reason that in our conception the ground discussed by us is sufficient to dispose of the case.

For reasons assigned, the judgment is affirmed.

---

(46 South. 312.)

No. 16,830.

LAWSON et al. v. McBRIDE et al.

(April 13, 1908.)

1. SIMULATION—EVIDENCE.

Upon the facts disclosed, a transaction purporting to be a sale from father to son of im-

movable property and a transfer to another son of the notes given in payment of the purchase price is held to be a simulation.

**2. SAME—RIGHTS OF BONA FIDE PURCHASERS —PLEDGE.**

Though a sale of real estate for a price represented by notes secured by mortgage be simulated, the mortgage may be enforced to the extent necessary for the payment of a debt contracted in favor of an innocent third person, to whom the notes have been pledged, with the approval of the apparent vendor of the property.

**3. SAME—PRESCRIPTION.**

The prescription of one year, whether under Civ. Code, art. 1987, or Civ. Code, art. 1994, has no application to attacks upon simulated sales.

(Syllabus by the Court.)

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Philip Sidney Pugh, Judge.

Action by W. E. Lawson and others against P. W. McBride and others. Judgment for defendants, and plaintiffs appeal. Reversed, and judgment rendered.

Joseph George Medlenka, for appellants. Hampden Story, for appellees.

## Statement of the Case.

MONROE, J. Plaintiffs W. E. Lawson, J. Frankel Company, Limited, and the Advance Thresher Company, as judgment creditors of Stephen O. McBride, bring this action to set aside an alleged sale of real estate, the allegations of the petition being, substantially, that Stephen O. McBride owned a certain lot, with the improvements thereon, in the city of Crowley, when the debts due to the plaintiffs were contracted; that on April 14, 1905, for the alleged consideration of the assumption by the purchaser of an existing mortgage amounting to $510, with interest, and the execution by the purchaser of six notes of $1,000 each, bearing interest and secured by mortgage, he "pretendingly sold" said lot to his son Pierre Walter McBride; that the notes given by P. W. McBride were turned over by S. O. McBride to his son O. Thaddeus McBride, who has "unlawfully

and without color of right" pledged them to Brooks & Clark, Limited, a Louisiana corporation, domiciled in the parish of Acadia, which is now in possession of them; that P. W. McBride and O. T. McBride well knew at the date of said transactions that S. O. McBride was insolvent; and that said pretended sale and transfer of notes were simulations concocted for the purpose of shielding the only property owned by him from which their (plaintiffs') judgments could be collected from their pursuit, or, in the alternative, that they were fraudulent, and were entered into for the purpose stated, or for the purpose of giving P. W. and O. T. McBride an unlawful preference over other creditors of said S. O. McBride. The prayer of the petition is that the parties named be cited, and that there be judgment decreeing said transactions to be simulated or fraudulent, and for an injunction restraining S. O. McBride and Brooks & Clark, Limited, from making any further disposition of the notes in question and restraining the concern last named from making any further advances thereon.

S. O. McBride answers that: "True it is he transferred the property * * * to P. W. McBride and received in consideration therefor the notes mentioned * * * and the assumption by P. W. McBride of the payment of the claim of $510; * * * that he in turn turned over said notes to O. T. McBride who became the owner thereof, for a valuable consideration, for his benefit."

O. T. McBride for answer asserts the verity and good faith of the transactions attacked, and alleges that he "acquired the note referred to and was the holder of said note prior to the institution of this suit, but that he in turn pledged the same to Brooks & Clark, Limited, as collateral security to secure a note of $2,000 executed by him * * * for advances for the making of the crop of rice for the year 1906; that your respondent became the owner of said notes from S. O. Mc-

LAWSON v. McBRIDE.

Bride, one of the defendants herein"; and that they were taken in satisfaction of a debt due by said S. O. McBride to your respondent." He also pleads prescription, and prays for damages for the alleged wrongful issuance of an injunction in a previous suit. P. W. McBride asserts the verity of the transactions in question and pleads prescription.

A preliminary injunction was issued restraining Brooks & Clark, Limited, from disposing of the notes in question or making further advances on them, which injunction is still in force.

It appears from the evidence that Stephen McBride is a carpenter and blacksmith, who had become a farmer, and who in 1899 owned property worth probably $15,000 as against which he owed his wife say $1,450, and perhaps other debts to other persons, though we infer that he was at that time in fairly comfortable circumstances; his family consisting of his wife, his sons Pierre, who had obtained majority, Patrick, who was about 20 years old, Thaddeus, who was 18 or 19 years old, and younger children, and possibly some who were older. In October, 1900, he bought from one Kelsey the property here in dispute (being an improved lot apparently suitable for commercial purposes in the city of Crowley) for $4,500, of which about one-third was paid in cash, and for the balance notes were given, maturing in one and two years and secured by mortgage. In April, 1905, the property so acquired was producing a rental of $50 a month, besides which a portion of it was occupied by Stephen McBride and his son Pierre for the purposes of a grocery store, which they were conducting as partners, and a portion was occupied by Pierre as a lodging. There was, upon the other hand, a mortgage debt resting on it, amounting, with interest, to nearly $600. On April 14, 1905, Stephen sold the property to Pierre (who, as a result of their business relations, was already considerably in his debt, and was without means and on the verge of failure) for $6,000, plus the mortgage debt, which the purchaser assumed as part of the price, giving his six notes of $1,000 each, payable year by year thereafter and secured by mortgage for the balance. The mortgage note which the purchaser assumed matured in August following the sale, and was paid from the funds of S. O. McBride & Son, or, more likely, from funds furnished by S. O. McBride. The notes given by the purchaser are said to have been turned over by S. O. McBride to his younger son Thaddeus on the day following the sale, and to have been kept by Thaddeus, generally in his pocket, sometimes in his trunk, until April, 1906, when they were pledged to Brooks & Clark, Limited, to secure advances made and to be made for the purposes of a rice crop. There had been in the meanwhile no change in the possession of the property for the price of which the notes had been given. The grocery had remained there, and, if any rent was charged by Pierre, we are not informed of it. Pierre himself continued to lodge there, and the other tenants remained. The only one of the two who testified in the case, M. L. Walker, being asked, "Since April 14, 1905, the date the property was transferred by S. O. McBride to his son P. W. McBride, to whom did you pay the rent?" replied: "I was to pay the rent to S. O. McBride through an order from P. W., all except one time when I paid P. W." In May, 1906, the grocery business was closed by a seizure and sale under execution, and during the same month Stephen McBride was adjudicated a bankrupt, his schedules showing liabilities largely in excess of his assets. The theory propounded by the defendants in explanation of the alleged sale of the property to Pierre and of the transfer of the notes to Thaddeus is that Thaddeus and Patrick, Stephen's younger sons had, for four or five years prior to April 14, 1905, planted rice, under an agreement

with their father whereby he was to make all the required advances of money and supplies and after deduction of the land and water rents they were to get, clear of all other deductions, their virile shares of the crops; that in 1900 it was understood between them that their father should buy the Kelsey property, and, retaining their earnings, should turn the property over to them so soon as the amount in his hands became sufficient to cover or reimburse the price; and that the course pursued of making a sale of the property to Pierre and turning over to Thaddeus the notes representing the price was in furtherance of said agreement, the notes having been delivered to Thaddeus for the benefit as well of Patrick as of himself. The evidence adduced in support of this theory makes it reasonably certain that Patrick and Thaddeus worked with varying success from 1899, when Patrick began, to 1904, inclusive, without having accumulated anything in the way of property or money as the result of their labor. Upon the other hand, the result, so far as Stephen was concerned, was that he became a bankrupt. And that result, according to the testimony of experienced rice planters (called as witnesses in the case), was inevitable, under the arrangement which is said to have existed between the parties. Thus, if Stephen was to pay all the expenses (save rents) from his share of the crops, the practical workings of the agreement, at least for the year 1904 will be appreciated when it is understood that the rice produced that year brought $1 per sack; that two-fifths of each sack, or 2 sacks in 5, were required to pay the land and water rents, so that each of the contracting parties got as his share one-fifth of each sack, or 20 cents worth of rice. But 20 cents will not pay the other expenses incidental to the production of one sack, and still less of three, so that, so far as Stephen was concerned, the more rice they made, the more money he would have lost, and that

would have been the case we apprehend during the greater part of the time covered by the alleged agreement. In this connection it may be remarked that before the trial of this case plaintiffs garnisheed O. T. McBride, and, having traversed his answers, examined him as a witness on the trial of the rule taken for that purpose, so that he was the first of the defendants to testify as to the questions here presented, and he then said (referring to his father):

"He made the advances, and what was left after paying the expenses went to pay for the property," etc.

And elsewhere his examination proceeds as follows (speaking of the year 1904):

"That year the whole family was out there [on a place known as the 'White' or 'Elder' farm]. We were all working, and they kept house for us that year. * * * Q. What did you make that year? A. I do not know what I made exactly. I made 1,400, and some odd—something around—between 1,400 and 1,500 sacks of rice. Q. Is it not a fact that W. E. Lawson made advances to make that very crop? A. I do not know. * * * Q. Do you not know that they did not make anything above expenses? A. I do not know. My labor was in there. That should be paid, I think, even if they did not make expenses."

If, however, they were all there "working," and the other members of the family made only a bare subsistence, it is not altogether clear why Thaddeus, unless he had a contract to that effect, should get more. And that he had no such contract would appear from the question and answer immediately following, to wit:

"What was your father to give you for your labor? A. He made no special transaction. I was to work to pay for the property. Q. How many years were you to work? How many years' labor were you to give for the property? A. Until it was paid for. Q. There was nothing definite? A. No, sir. * * * Q. You had no accounting between you to find out just what your father owed you? A. No, sir. * * * (Re-examined, apparently, by his own counsel.) Q. Did your father have any interest in that crop? A. No, sir; it was supposed to be ours. * * * (By the Court.) Q. As I understand it, you say that in 1900 your father bought that property for you and your brother? A. He got a piece of property, and he said: 'If you are

willing to go out and work for that property, I will let you have it—will sell it to you' (italics by the court)."

On his examination in this case the witness testifies, in part, as follows:

"Q. Your father was paying all the expenses out of his share of the rice, which share was to be the same proportion as yours? A. He was to pay the expenses, and we were to get our share of the crop. Q. Well, the years that you and your father and brother were in together, the rent of the land was one-fifth and the water rent was one-fifth? A. Yes, sir. Q. Then there were three-fifths to be divided between you and your brother S. P., and your father? A. Yes, sir."

Being asked to explain how it happened that he testified on his first examination that the expenses were to be deducted before the distribution of the shares in the crops and to reconcile such testimony with that above given, he made no intelligible explanation. He admits that the expenses, which he says were assumed by his father, amounted to from 35 to 45 cents per sack, and his testimony on that subject is more than corroborated by that of experts. Thus, P. S. Lovell, a planter, testifies that under the most favorable conditions it cost him between 1900 and 1904 $1.50 a sack to make his rice, including labor and water rent, and excluding land rent, so that, if the land rent of one-fifth be added, the cost would have been $1.87½ per sack. And Miron Abbott, another planter, testifies that the bare cost of sacks, twine, and threshing cannot be less than 37½ cents per sack, to which, for the purposes of this case would be added the expense of the use and feed of teams, and, as we imagine, a portion of the expense of harvesting. If, however, the father and sons made the agreement to which they testify, it is unfortunate that they should now differ so widely in their recollection as to the result. According to the testimony of Stephen there was due to Thaddeus and Patrick each, in April, 1905, between $2,250 and $2,750. From the testimony of Thaddeus, the

121 La.—10

amount due him at that time would appear to have been, say $5,190; and from the testimony of Patrick, supplemented by that of Thaddeus as to the prices in 1905, the amount then due him was, say $4,800. Upon the other hand, Pierre, who handled the proceeds of the crops, and was himself interested in the crops of 1901, 1902, and 1903, places the amount due to his two brothers, exclusive of the year 1904, at about $15,000.

Thaddeus was interrogated and answered:

"Q. Did your father ever settle with you for the crops made by you during the various years you have testified to? A. Yes, sir; he gave the notes. He sold the property to my brother, and I got the notes. Q. And you discounted the notes and got $4,500? A. No, sir; he gave me the discount on the notes. I did not get $4,500. I just passed it over—what I got on my crop—to Brooks & Clark, for advances on my crop. Q. Brooks & Clark got the notes? A. Yes, sir. Q. In other words, your father acted as your agent? A. Yes, sir."

From which it might be inferred that, when, a year after they are said to have been delivered to him, Thaddeus undertook to pledge, for his own account, the notes which we are told were intended for Patrick and him, it was through his father that the business was arranged. In this case the same witness gives the following testimony, to wit:

"Q. Now, Mr. McBride, in 1905, April 14th, when your father sold you this property, you knew that he was in a pretty bad fix? A. I knew that everything was getting away, and we had gotten no attention. It was all he had to dispose of. He had done away with the farm at Church Point and spent the money for debts, so we got a little bit uneasy about ourselves, and I asked what was to become of us. That we had worked for the property, and was figuring on it, and he said he would be willing to sell and get notes for it, and we said: 'Yes; we could handle it better than a sale. That we could get money out of the notes.'"

The facts to which the witness refers when he says "that everything was getting away" are that on April 7, 1905, Stephen McBride had sold his Church Point farm for $9,000, of which $5,000 was cash, and the balance in notes. The notes he had turned

over to a creditor in·payment of a debt due him, and of the cash he had used part in paying other debts, and presumably had put the rest in his pocket, whilst there were still a number of debts left unpaid, as appears from his schedule in bankruptcy, filed a few weeks later. On the day upon which the transaction with Pierre was entered into he made a dation en paiement to his wife of a residence property in South Crowley in satisfaction of a paraphernal claim amounting to $1,450, and after the conveyances thus mentioned had been executed he had but little of value left, save the property here in controversy; his assets consisting of a lot in Crowley, valued at $100, a piece of land in Calcasieu, valued at $200, possibly two pairs of mules, valued at $850, and his interest in the stock and open accounts of the grocery store, sold shortly afterwards by the constable, for a few hundred dollars.

S. O. McBride and P. W. McBride attempt to sustain the transactions of which plaintiffs complain, but their testimony is no more coherent or convincing than is that of O. T. McBride, and the same thing may be said of the testimony of S. P. McBride, who, though said to have been equally interested with his brother in the Kelsey property, appears to have been entirely ignored when the proceeds of that property (the notes here in question) were disposed of, and when his father and brother filed their answers in this suit, and has appeared in the case only as a witness, and later for the purpose of taking an appeal. There is nothing in the record to cast any doubt upon the good faith of Brooks & Clark, Limited. It does not appear that the members of that concern knew, or had any reason to suspect, the purpose for which the Kelsey property was put in the name of P. W. McBride, and plaintiffs admit that they are entitled to be protected to the extent of the advances made by

them, up to the date of the service of the injunction, say to the amount of $1,530.58.

The learned judge a quo, in concluding his carefully prepared opinion, says:

"I hold that there was no simulation in the transfer of the property or the notes; that the sale to P. W. McBride was real; that the transfer of the notes by S. O. McBride to his two sons was made in fraud of other creditors; that S. O. McBride was insolvent at the time of said transfers; that the prescription of one year should be maintained to the extent above mentioned under Civ. Code, art. 1987, which protects contracts made to secure just debts; that the transfer of said notes should be maintained to the amount of $3,300, out of which $3,300, Brooks & Clark, Limited, should be paid the $1,558.98, as well as the balance due on the note of $2,000."

And there was judgment accordingly, from which O. T. & S. P. McBride having appealed, plaintiffs took an appeal as to S. O. & P. W. McBride, and, the respective appellees having answered the appeals of the others, the parties are all before this court about as they were before the district court.

### Opinion.

At the date of the alleged sale from S. O. to P. W. McBride which is here attacked S. O. McBride owed these plaintiffs amounts aggregating some $1,600, and owed other debts besides, and we agree with the judge a quo in the conclusion that he was insolvent. O. T. McBride says in his testimony:

"I knew that everything was getting away, and we had gotten no attention. It [the Kelsey property] was all he had to dispose of. He done away with the farm at Church Point and spent the money for debts, so we got a little bit uneasy about ourselves."

And the testimony of S. P. McBride is much to the same effect. The theory that defendants seem to wish the court to adopt is that Stephen McBride agreed that, if his two younger sons Patrick and Thaddeus would undertake the working of rice crops and would turn their earnings over to him, he would buy the Kelsey property, and, when

their earnings should have reached the amount of the price, would convey it to them; that the working agreement into which they entered was that Stephen was to make all the advances necessary for the crops; and that the proceeds, after deducting the land and water rents (amounting to two-fifths, and payable in kind), were to be divided between them, with no deduction for such advances, so that, save the land and water rents, the entire expenses were to be borne by the one-fifth of the crop which Stephen was to receive, or else were to be paid from his pocket. The testimony of the defendants is not coherent upon either of the points stated. Thaddeus being asked by the judge, "Your father bought that property for you and your brother?" replied: "He got a piece of property, and he said: 'If you are willing to go out and work for the property, I will let you have it—will sell it to you'"—from which we conclude that he intended to convey the idea that Stephen's acquisition of the property was not the result of any previous agreement with his sons, but was an accomplished fact when the agreement with them was made. The same witness (at other times) and his brother Patrick testify that Stephen purchased the property after and as part of his agreement with them. Upon the subject of the terms of the agreement in question Thaddeus, as we have seen, on his first examination, testified that there was nothing definite, or, to quote his exact language: "He [Stephen] made no special transaction. I was to work to pay for the property." He stated repeatedly that the advances to be made by his father were to be deducted or reimbursed before dividing the crops, and as often (but later, and after the parties had had time to realize that, if the advances were to be considered as deducted before the division, there would perhaps have been nothing to divide) that the advances were not to be deducted but were to be borne exclusively by his father. Nor do we find the testimony of the other witnesses more satisfactory. On the other hand, we have undisputed testimony from witnesses without interest from which it appears that such an agreement as that now relied on by defendants is unheard of, and must inevitably have resulted in serious loss to Stephen McBride. We have the fact that he and his sons had had considerable experience in rice planting, and that he at least was not unfamiliar with the risks of the business; that he was an intelligent man, well advanced in years, with a large family, and comparatively small means which had been accumulated during a life of hard work —all of which, considered, it seems to us highly improbable that for the benefit of the two who were best able to take care of themselves he would have so greatly imperiled the resources to which he and the more helpless members of his family were naturally looking for their immediate and future support. Nor is the impression so created at all weakened when we consider the manner in which the alleged agreement is said to have been carried into effect. If the Kelsey property was bought for Thaddeus and Patrick with the understanding that it was to be turned over to them so soon as their earnings to be accumulated in the hands of their father should be sufficient in amount to reimburse the price, it was necessary to the carrying out of such understanding that some one should have kept an account of the earnings, but no such account was kept, and of the four members of the family who have testified no two of them agree as to the amount. For several years Pierre worked with his brothers in planting rice, though upon an independent basis, and the crops were sold through S. O. McBride & Son, of which concern he was a member and the bookkeeper. He was examined at great length as a witness, but professed to be unable to produce the more important books of the firm, or to

do more than guess at the results, so far as the different crops were concerned; his testimony throughout being shuffling, evasive, and altogether unsatisfactory. If the testimony so given be accepted as true, the amount earned by Thaddeus and Patrick far exceeds that claimed by them or admitted by their father. If, upon the other hand, the amount be as stated or admitted by the others, then Thaddeus and Patrick, having complied with their agreement (pretermitting the question of preference) were entitled to the property, and we can discover no sufficient reason for the conveyance of it to Pierre.

It is said that the arrangement as thus made was satisfactory to Thaddeus and Patrick; but it appears to us that Patrick had little or nothing to say in the matter, for, as has been noted, Stephen and Thaddeus assert in the answers filed by them that the notes given as the purchase price of the property are owned by Thaddeus, and Thaddeus, on his first examination, stated, under oath, that the notes were his. He also testifies, as do the others, that the notes were placed and remained in his possession until he pledged them to Brooks & Clark, Limited, and were carried about in his pocket, or now and then perhaps deposited in his trunk, and this, although in the meanwhile Patrick was sorely in need of collateral security upon which to borrow $200 for the making of a crop. Moreover, the notes were pledged to Brooks & Clark, Limited, in connection with a matter in which Patrick had no interest, and to secure an obligation for which he was not bound.

Considering the other features of the alleged sale, we find that Pierre was wholly without means or prospects which would authorize the assumption that he was or would ever be able to pay for the property, and he was already, as we think, heavily in debt to his father, the vendor. The mortgage debt of, say $510, and interest, which he assumed as

part of the purchase price, fell due shortly after the purchase, and, according to his testimony, was paid from the funds of S. O. McBride & Son.

We are inclined to think that it was paid with funds furnished, directly by S. O. McBride, but whether in the one way or in the other it was really paid by S. O. McBride, since the firm owed him much more than it was able to pay. It is not pretended that after the transfer of the title the supposed vendee charged the firm of S. O. McBride & Son rent for that portion of the premises occupied by it, and it is shown affirmatively that the only other tenant who was examined continued to pay his rent to the supposed vendor, Stephen McBride.

Considering, then, the relations which the defendants bear to each other, in connection with the facts stated, our conclusion is that the transaction purporting to be a sale between Stephen McBride and his son Pierre was a simulation, pure and simple, the purpose of which was to screen the property of Stephen McBride from the pursuit of his creditors, and to enable him to make use of the notes representing its supposed value for the continuance in the same manner as before of the planting operations conducted by his son Thaddeus and himself. Patrick had married, and to some extent gone off to himself, and his father apparently did not rely upon his further co-operation; but Thaddeus was younger and unmarried, and, as we take it, more under the paternal influence, and it was therefore through him or in his name that the securities were to be handled. It may be that, if a settlement could be arrived at between them, it would be found that the father is indebted to the sons as the result of the business carried on by them; but to what amount it is impossible to say.

As we are unable, however, to accept the theory propounded as to the terms of their agreement; and as, upon the whole, the busi-

ness was unprofitable, we do not think the amount would be large. And for that reason, as well as for the other reasons which have been given, we do not believe that there was any intention to transfer to the sons either the property in question or the notes representing the price. Brooks & Clark, Limited, are shown to have agreed to make advances to Thaddeus McBride to the extent of $2,000 upon the faith of an apparently, valid mortgage, and actually to have advanced $1,530.58. up to the date of the service of the injunction in this case, or rather up to, say June 5th. Whether their contract was made with Thaddeus McBride or with his father professing to act for him, or was the result of negotiations in which both father and son participated, there is no doubt that it was made with the full approval of Stephen McBride. The mortgage purporting to secure the six notes of $1,000 each which were then given in pledge having been thus used by, or with the approval, and, as we think, for the benefit of, the real owner of the property, must therefore be sustained to the extent necessary for the satisfaction of the contract so made.

The prescription of one year (whether established by Civ. Code, art. 1987 or 1994), relied on by defendants, has no application to attacks upon simulated transactions. Dennistoun et al. v. Nutt et ux., 2 La. Ann. 483; Dunn v. Woodward, 11 La. Ann. 265; Gladney v. Sheriff et al., 48 La. Ann. 316, 19 South. 276.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and, proceeding to render such judgment as should be rendered, it is further decreed that the transaction purporting to have been a sale by act of date April 14, 1905, from Stephen O. McBride to Pierre Walter McBride, of lot No. 15, in block No. 63, in the city of Crowley, be held to have been a simulation, pure and simple, and to have been and to be of no effect; that the mortgage granted by said act be recognized to the extent necessary for the payment of any balance which may be due upon the note of $2,000 given by O. T. McBride to Brooks & Clark, Limited, and bearing date April ———, 1906; and that otherwise said mortgage be canceled and erased, and that, subject to the payment of said debt to Brooks & Clark, Limited, the property in question be held liable to seizure and sale in satisfaction of the judgments obtained by plaintiffs against Stephen O. McBride and herein set up.

It is further decreed that defendants Stephen O. McBride, Pierre W. McBride, and O. Thaddeus McBride pay all costs.