LE PREMIER PROCESSORS, INC., Erin Brooke, Inc., and Le Premier Products, Inc.

v.

UNITED STATES of America.

Civ. A. No. 90–0718.

United States District Court, E.D. Louisiana.

Dec. 3, 1990.

Russell Scott Stegeman, Stegeman & Associates, Gretna, La., James Sidney Holliday, Jr., Peter J. Losavio, Jr., Kathryn Wyble, Holliday & Jackson, Baton Rouge, La., Thomas P. Anzelmo, Campbell, McCranie, Sistrunk, Anzelmo & Hardy, Metairie, La., for plaintiffs.

David N. Crapo, U.S. Dept. of Justice, Washington, D.C., Eneid A. Francis, U.S.

Attorney's Office, New Orleans, La., for defendant.

## OPINION

PATRICK E. CARR, District Judge.

This matter came before the Court without a jury on Thursday, September 13, 1990 for an evidentiary hearing on the plaintiffs' motion for preliminary injunction and on the merits. The Court now DENIES the motion and DISMISSES the action on the merits. Pursuant to F.R.Civ.P. 52, the Court makes the following findings of fact and conclusions of law.

### I.

Breaux & Daigle, Inc. is a family-run and -owned business that processes and sells crabmeat in Pierre Part (Assumption Parish), Louisiana. In April 1988, it filed an action in this Court for refund of federal employment taxes (specifically, social security contributions and federal unemployment taxes) for the years 1984 and 1985 in the amount of $2.53; the United States counterclaimed to recover unpaid employment taxes for the same period. In May 1989, after a trial in April 1989, the Court held that crabmeat pickers working for the company were employees and not independent contractors for federal employment tax purposes; thus, the Court entered judgment in the government's favor for its entire claim of $65,693.33, plus interest, statutory additions, and costs. *See Breaux & Daigle, Inc. v. United States*, Civ. 88–1535 (Section "D"), 1989 WL 119058. On appeal, the Fifth Circuit affirmed. *See* 900 F.2d 49 (5th Cir.1990). In both this Court and the Fifth Circuit, counsel representing the company was Peter J. Losavio Jr.

Alger J. Daigle; his wife, Roberta Breaux Daigle; and their two sons, Antho-

ny P. and Michael J. Daigle, are the sole shareholders in the company. Alger, Roberta, and Anthony held various positions as officers and directors of the company when the employment tax liabilities were incurred. These three live adjacent to the Breaux & Daigle plant; Michael lives in South Carolina and does no work for Breaux & Daigle.

A certified transcript of "assessments and payments" from the Memphis IRS Center indicates that on January 11, 1989, the IRS assessed an $18,881.37 penalty against Alger for the year 1985; that a first notice of this penalty assessment was mailed to him on January 11, 1989 and then again on March 6, 1989; that a tax delinquency notice for this penalty assessment was mailed to him on May 1, 1989;[1] and that accumulated interest totaled $309.74 as of March 6, 1989 for a total balance due of $19,-191.11. *See* Exh. G–3a. Another certified transcript indicates the same for Roberta.[2] *See* Exh. G–3b. Anthony and Alger each denied recalling any knowledge of these various notices; ill, Roberta did not testify.

On July 27, 1989, the Houma office for the IRS sent Alger, Roberta, and Anthony substantially similar letters advising them that it "propose[d] to assess a penalty against" each of them under I.R.C. [26 U.S.C.] § 6672 as a responsible person for the employment taxes owing from Breaux & Daigle for the year 1985. *See* Exhs. P–4, P–8, P–9. Anthony and Alger each testified that these letters were the first notice they received of any efforts by the IRS to make any penalty assessments against them for Breaux & Daigle's unpaid employment taxes.

There is no evidence on the one hand that Alger, Roberta, or Anthony ever contested these penalty assessments against them or

---

**1.** At the hearing, the government sought to introduce what it asserted were copies of these actual notices. Because the government did not properly authenticate these uncertified, unsealed documents, which the government's witness, IRS Collection Agent Steve Fanguy, acknowledged he did not personally issue, the Court sustained the plaintiffs' objection to the introduction of these documents through Agent Fanguy.

**2.** While the name on the certificate is "Robert B. Daigle," the Court finds that the word "Robert" was a typographical error for "Roberta." Not only did the plaintiffs' counsel at the hearing (whose co-counsel of record is Losavio) not object to the discrepancy, but also the Social Security number on the certificate is Roberta's. *Compare* Exh. G–3b *with* Exhs. P–2, P–3, and P–8.

on the other that the IRS has collected any money from either Alger or Roberta for the assessments against them.

Meanwhile, on February 7, 1989, Losavio had three companies incorporated under Louisiana law for the Daigles: Le Premier Products, Inc.; Erin Brooke, Inc.; and Le Premier Processors, Inc. The articles of incorporation for each list an employee of Losavio as the sole incorporator, Anthony and Michael as the sole directors, Anthony as the president, Losavio as the registered agent for service of process, and Losavio's law office as the registered corporate address. See Exhs. G–5a to G–5c. None of the corporations ever obtained a license to do business in Assumption Parish; in fact, Anthony admits that the three corporations have not done "any business."

The next day, February 8th, Roberta transferred a Ford van she owned to Le Premier Products, Inc. in return for 250 shares of its stock, see Exh. G–6b; Alger transferred a Volvo car he owned to the company in return for another 100 shares of its stock, see Exh. G–6c; and the couple together transferred three tracts of immovable property they owned, including their and Anthony's homes and the land on which the Breaux & Daigle plant is located, to the company for another 1000 shares of its stock, see Exh. G–6a. These three assets are and have always been the sole assets held by Le Premier Products, Inc. There is no evidence that this corporation issued any share of stock other than these 1350 shares.

That same day, February 8th, Alger transferred a houseboat he owned to Erin Brooke, Inc. in return for 1000 shares of its stock. See Exh. G–6d. This asset is and has always been the sole asset held by Erin Brooke, Inc. There is no evidence that this corporation ever issued any share of stock other than these 1000 shares.

That same day, February 8th, Alger and Roberta formed "The Alger and Roberta Daigle Trust for the Benefit of Michael J. Daigle." The trust is designated an irrevocable spendthrift trust under Louisiana law; the sole beneficiary is Michael, and the sole trustee is Anthony. See Exh. G–7. Upon creation of the trust, Alger and Roberta transferred to the trust 1000 shares of stock in Le Premier Products, Inc.; 1000 shares in Erin Brooke, Products, [sic] Inc.; and 1000 shares in Le Premier Processors, Inc.[3] See Exh. G–7a. These shares of stock are and have always been the sole assets held by the trust.

These various documents—the articles of incorporation, the trust agreement, and the acts of transfer—were all drafted and notarized by Losavio.

Anthony testified—in only the most vague and conclusory of terms—that these various transfers were the result of "estate planning" begun in early 1987 in response to Alger's earlier diagnosis of cancer. Yet neither Anthony and Alger in their testimony nor their attorneys in the briefs have explained how or why this elaborate, deliberate scheme furthered any legitimate estate planning purpose that Alger and Roberta may have had; for example, Alger was unable to answer why only one child, wayward Michael, was made the beneficiary of the various transfers. Further, on questioning from the Court, Anthony admitted that he and his parents were aware, through advice of Losavio and co-counsel, that the three would each be subject to personal penalty assessments if Breaux & Daigle lost its refund action. Finally, Anthony and Alger gave conflicting explanations for the alleged delay between 1987 and 1989. On the one hand, Anthony testified that a delay occurred because "lots of time" was needed for Losavio to prepare the various documents. On the other, Alger testified that a delay occurred because the family was "waiting to see how [his] health improved."

According to Alger's testimony, the only asset he and Roberta retained was "a little property in case [they] needed money for [his] illness."

Alger, Roberta, and Anthony have continued to use these various assets—the

---

**3.** According to Alger's testimony, certain assets of Breaux & Daigle (and no assets of Alger or Roberta) were transferred to Le Premier Processors, Inc.

van, car, houseboat, and three parcels of land—for their own unrestricted personal use without paying any rent. Anthony testified that in "mid–1988" (which was months before any of the three plaintiffs were in existence) he and his parents had executed a "verbal lease" with Le Premier Products, Inc. for their use of both the land *and the houseboat.*

The records of the Office of Motor Vehicles for the Louisiana Department of Public Safety and Corrections still show Roberta as the owner of the van and Alger as the owner of the car. *See* Exhs. G–13, G–15a. Alger as named insured and Roberta as additional insured have been covered by automobile insurance policies for the van since at least March 1989 and for the car since at least September 1989; none of these policies lists Le Premier Products, Inc. as a named or additional insured or as a loss payee or owner. *See* Exh. G–20.

In September 1989 and again in March 1990, Alger and Roberta refinanced loans with a bank and used these parcels of land as security. *See* Exh. G–19, at 1–5. Further, Alger and Roberta have been named insureds on homeowner's policies for their home on this land since at least October 1987, and Alger alone on fire insurance policies since at least April 1988; likewise, none of these policies lists Le Premier Products, Inc. as a named or additional insured or as a loss payee or owner. *See* Exh. G–20a. While the transfer of these three parcels was recorded on February 8, 1989 with the Clerk of Court for Assumption Parish, the property tax rolls for Assumption Parish list the owner of the parcels as "Le Premier Product Inc. c/o Roberta B. Daigle" at her mailing address. *See* Exh. G–8a.

The transfer of the houseboat to Erin Brooke, Inc. was not registered with the Louisiana Department of Wildlife and Fisheries until October 9, 1989, *see* Exh. G–12— one day before IRS Collection Agent Steve Fanguy was scheduled to meet with Losavio about collection of the Daigles' penalty assessments.

The trust instrument directs the trustee (viz., Anthony) to make annual income distributions to the beneficiary (viz., Michael). *See* Exh. G–7, ¶ 7.1, at 2. Yet according to Anthony's testimony, he has made no such distributions.

On February 5, 1990, the IRS sent Roberta a letter advising her that it had just filed with the Clerk of Court for Assumption Parish a Notice of Federal Tax Lien that named Le Premier Products, Inc. as her nominee for the three parcels of land. *See* Exh. P–2. On the same day, the IRS sent Alger a similar letter advising him that it had just filed a second Notice of Lien that named Le Premier Products, Inc. as his nominee for the same three parcels and a third Notice that named Erin Brooke, Inc. as his nominee for the houseboat. *See* Exh. P–1. Each of the three notices lists the date of assessment of the civil penalty as January 11, 1989 and the unpaid balance of assessment as $19,191.11.

On February 9, 1990, Losavio sent the New Orleans IRS District Director an application for non-attachment of the three nominee liens under I.R.C. § 6325(e) and Treas.Reg. [26 C.F.R. §] 301. 6325–1(e). *See* Exh. P–3. The IRS never responded.

On February 22, 1990, the IRS seized the houseboat that Alger had transferred to Erin Brooke, Inc. and the three parcels of land that Alger and Roberta had transferred to Le Premier Processors, Inc. Other than the seizure of these two assets, the IRS has collected no monies on the penalty assessments against Alger and Roberta. According to the uncontradicted testimony of Agent Fanguy, the sole assets that Alger and Roberta purport to hold is just 500 shares of bank stock; the record contains no indication of the value of these shares.

On February 26, 1990, the three corporations (i.e., Le Premier Products, Inc.; Erin Brooke, Inc.; and Le Premier Processors, Inc.)[4] filed the instant suit against the United States under 28 U.S.C. § 1346. The sole prayer for relief is one for monetary damages under I.R.C. § 7433. Losavio and

---

4. The Court is at a loss why Le Premier Processors, Inc., which has never held or purported

to hold an interest in any of the seized assets at issue here, joined this action.

co-counsel signed the complaint. *See* Record Document No. [R.Doc.] 1.

Along with the complaint, the plaintiffs filed a motion for temporary restraining order and preliminary injunction seeking to enjoin the IRS from selling the van, car, houseboat, or any of the three tracts of land. *See* R.Docs. 3–4. At a status conference before the Court on March 1, 1990, the plaintiffs agreed not to transfer and the United States agreed not to sell or advertise any of these various assets pending this Court's ruling on the plaintiffs' motion for preliminary injunction. *See* R.Doc. 5.

Under F.R.Civ.P. 65(a)(2), the Court advised all counsel orally and in writing that the trial of the action on the merits would be advanced and consolidated with the hearing on the motion for preliminary injunction. *See* R.Docs. 18, 20. To give the parties appropriate discovery time and in light of the mutual forbearance agreement, the Court set the trial for hearing 1½ months thereafter, on September 13, 1990.

## II.

The plaintiffs assert three principal defenses to the IRS's present efforts to collect the penalty assessments against Alger and Roberta. First, the assessments against these two are time-barred under the applicable three-year limitation period. Second, the assessments are improper on the merits. Third, Alger and Roberta hold no interest in the assets at issue. The Court rejects all three defenses.[5]

**5.** In only the most cursory and conclusory fashion, the plaintiffs also assert they will be irreparably injured if the IRS sells the seized assets. Even if the plaintiffs could establish liability for wrongful levy (viz., could establish that Alger and Roberta hold no interest in the seized assets), the plaintiffs have failed to establish that they are entitled to *injunctive* relief under I.R.C. § 7426(b)(1). Specifically, they failed to present any evidence, must less establish by a preponderance of the evidence, that they would be irreparably injured if the IRS sells the seized assets; indeed, their briefs do not even allege a factual basis for this conclusory assertion. In other words, the plaintiffs have made no showing that the full panoply of money damage remedies under I.R.C. § 7426 would be insufficient—especially here where there is no conten-

## A.

The plaintiffs contend that under I.R.C. § 6501 and Treas.Reg. 301.6501(b)–1(b), any penalties against Alger and Roberta for the year 1985 should have been assessed on or before April 15, 1989. Noting the July 1989 letters proposing to assess such penalties, the plaintiffs suggest that the assessments against Alger and Roberta for such penalties were not made until at least three months after the limitation period had expired in April 1989. Thus, the plaintiffs argue that liability for any such penalties is now time-barred. The Court rejects the plaintiffs' position for two independent reasons.

### 1.

A plaintiff in a wrongful levy action concerning a federal tax lien for satisfying a federal tax assessment against another person may not attack the validity of the tax assessment. In such actions, the assessment "shall be conclusively presumed to be valid." I.R.C. § 7426(c). In other words, Alger and Roberta alone—and not the three plaintiffs or any one else—have standing to dispute the correctness of the penalty assessments[6] against Alger and Roberta. The reason for the rule is simple: persons who purport that a third-party taxpayer has no interest in their property under seizure should be disinterested in what assessments the IRS may make against the third-party taxpayer. Thus, in sum, the plaintiffs lack standing to assert this prescription argument.

tion that any of the plaintiffs are using, have ever used, or will ever use these assets for any corporate business of any kind. Thus, the plaintiffs cannot escape the anti-injunction provisions of I.R.C. § 7421(a). *See generally Bob Jones University v. Simon,* 416 U.S. 725, 737, 94 S.Ct. 2038, 2046, 40 L.Ed.2d 496 (1974); *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 6–7, 82 S.Ct. 1125, 1128–29, 8 L.Ed.2d 292 (1962).

**6.** A penalty under I.R.C. § 6672 is considered a "tax" within the meaning of I.R.C. §§ 7421–7434. *See Souther v. Mihlbachler,* 701 F.2d 131, 132 (10th Cir.1983) (per curiam). *See generally* I.R.C. § 6671(a).

In response, suggesting that this presumption of validity does not apply to claims under I.R.C. § 7433, the plaintiffs argue without support that they may assert their claims under both section 7426 and section 7433. The plaintiffs misstate the law: a person seeking relief under section 7426 may not additionally or alternatively seek relief under section 7433. Section 7433(a) provides:

If, in connection with any collection of Federal tax with respect to *a taxpayer,* any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, *such taxpayer* may bring a civil action for damages against the United States in a district court of the United States. Except as provided in section 7432 [permitting civil actions *by a taxpayer* for the IRS's knowing or negligent failure "to release a lien under section 6325 on property *of the taxpayer* "], such civil action shall be the exclusive remedy for recovering damages resulting from such actions. [Emphasis added]

As the Court's underscoring emphasizes, the very terms of section 7433(a) limit its remedies to just the taxpayer against whom the IRS has asserted the tax assessment, and those remedies are the sole ones available to the taxpayer for damages from any such reckless or intentional actions. *Cf. United States v. Doyal,* 462 F.2d 1357, 1358 (5th Cir.1972) (per curiam) ("section 7426 is not available to persons against whom the tax has been assessed").

In other words, in this instance, only Alger and Roberta are permitted to assert possible claims under section 7433(a) in connection with the IRS's efforts to satisfy the penalty assessments against them. As a matter of law, the plaintiffs state no cause of action under section 7433; [7] their sole possible cause of action is under section 7426. Thus, it is immaterial that persons

asserting claims under section 7433 may be entitled to assert similar prescription defenses.

To hold otherwise would ignore the broad statutory proscription in I.R.C. § 7421 against a "suit for the purpose of restraining the assessment or collection of any tax" as well as the general rule that waivers of federal sovereign immunity are strictly construed and thus must be explicit.

2.

■ The plaintiffs note that the government did not introduce a copy of any actual assessment notice sent to either Alger or Roberta. *See* footnote 1 above. The government did, however, introduce certified transcripts from the main IRS Service Center for this region showing that the IRS had assessed the 1985 penalties against Alger and Roberta on January 11, 1989. These certificates are sufficient to establish an evidentiary basis for the fact and date of assessment. *See United States v. Chila,* 871 F.2d 1015, 1017–18 (11th Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 501 (1989).

The Court disbelieves Anthony's testimony that the earliest notice he recalls he and his parents had of any kind, written or otherwise, that the IRS was intending to assert penalty assessments against him and his parents was the July 1989 letters from the local IRS branch office. First, his demeanor on the witness stand was guarded, and his responses not spontaneous; further, as discussed below, the Court found other, material testimony from him unworthy of belief. Second, he testified that he reviewed all mail from the IRS to him, his parents, or Breaux & Daigle. Third, from Alger's testimony that Anthony but not Alger had met directly with Losavio about the "estate planning," the Court infers that Anthony was the family member who assumed the lead role in the family's tax debacle.[8] Thus, the Court determines that

---

7. Because the plaintiffs state no cause of action under section 7433, the Court need not decide what constitutes sufficient exhaustion of administrative remedies under section 7433(d)(1).

8. Alger likewise testified that he did not recall any notice from the IRS prior to July 1989. While the Court did not disbelieve Alger's testimony about *not recalling* any such notice, the Court gave his testimony little weight. On the one hand, Alger has been suffering from ill

the letters sent in July 1989 were sent in error insofar as the letters implied that penalty assessments had not already been made against Anthony, Alger, and Roberta.[9]

In sum, then, the Court determines that the 1985 penalty assessments against Alger and Roberta were made on January 11, 1989—over three months before the deadline of April 15, 1989.

### B.

The plaintiffs contend that Alger and Roberta, although they were responsible persons for Breaux & Daigle's tax responsibilities, did not "willfully" fail to have Breaux & Daigle meet these responsibilities within the meaning of I.R.C. § 6672(a). In support, they merely point to a letter dated December 31, 1985 from the IRS to another seafood processing company that that company could treat its crawfish peelers as independent contractors for employment tax purposes, Exh. P–11. Thus, the plaintiffs assert that the penalty assessments against Alger and Roberta must fail on the merits. Again, the Court disagrees.

### 1.

The reasons in Part II(A)(1) above why the plaintiffs' statute-of-limitations defense must fail in this action apply equally to this second defense: the plaintiffs may not attack the validity of the penalty assessment against Alger and Roberta.

### 2.

■ Without more, this letter is insufficient to infer that the Daigles may have been in good faith and with reasonable cause in not having Breaux & Daigle pay its full employment taxes. *Cf. Knighten v. Commissioner of Internal Revenue*, 702 F.2d 59, 60 (5th Cir.) (per curiam) (tax assessments are presumed valid, and the tax-

payer has the burden to prove otherwise), *reh'g & reh'g en banc denied,* 705 F.2d 777 (5th Cir.) (per curiam), *cert. denied,* 464 U.S. 897, 104 S.Ct. 249, 78 L.Ed.2d 237 (1983). The plaintiffs made no showing that the crawfish peelers at the seafood processing company referred to in the letter were in a substantially similar position to Breaux & Daigle's crabmeat pickers. Further, while Anthony indicated he had been aware of this letter, there is no basis in the record to infer that either his parents or he was aware of this letter—which, to emphasize, is dated December 31, 1985—at any time before Breaux & Daigle's employment tax returns were filed for the year 1985.

In any event, a showing of good faith is insufficient to overcome a finding of "willfulness" in this case, where there is no contention that the Daigles negligently overlooked having Breaux & Daigle pay the full amount of its employment tax obligations. "Willfulness under [I.R.C. § 6672] requires a voluntary, conscious, and intentional act, but not a bad motive or evil intent." *Gustin v. IRS,* 876 F.2d 485, 492 (5th Cir.1989). Indeed, the decision to seek a refund of just $2.53 for two years' worth of employment taxes evinces not an absent-minded attitude toward tax responsibilities, but a specific plan and intent by the Daigles on the issue whether their company should continue to pay employment taxes (as it had prior to 1984, *see Breaux & Daigle,* 900 F.2d at 50). In sum, the Daigles intentionally, or "willfully," chose to have Breaux & Daigle not pay its employment taxes.

### C.

The plaintiffs next contend that Alger and Roberta had no interest in the property

---

health from at least 1985; on the other hand, whether wise or not, he apparently chose to let his son Anthony handle the family's tax matters.

**9.** In their post-trial memorandum, the plaintiffs attempt to rely in part on an undated "news release." *See* R.Doc. 30, at 8. The Court refuses to consider the document. First, the plaintiffs did not seek to introduce the document at the hearing. Second, they have made no showing that the document was not reasonably available

or discoverable before the hearing. Third, the document appears wholly immaterial. Finally, the document constitutes hearsay not within the "commercial publication" exception under F.R.Ev. 803(17) or other hearsay exception. The accompanying IRS "memorandum" (stating that "the collection process is built upon the foundation of a valid assessment and the statutory lien that it creates") appears equally immaterial.

at issue at the time the IRS made its penalty assessments. Presumably in an attempt to shift the focus from the IRS's strong "alter ego" arguments, the plaintiffs argue that the tax liens are invalid against them under I.R.C. § 6323(a) because under I.R.C. § 6323(h)(6) and Treas.Reg. 301.6323(h)–1(f), they are "purchasers" who acquired the assets at issue before notice of any tax liens were filed in the appropriate place for filing under I.R.C. § 6323(f). As the government notes, this argument is wholly misplaced because the government is not asserting "transferee liability" against the plaintiffs.[10] *Cf. Lemaster v. United States*, 891 F.2d 115, 119 (6th Cir.1989) (per curiam).

■ The Court turns to the central dispute between the parties: whether Alger and Roberta hold any interest in the assets under seizure. The government convincingly suggests that the plaintiffs are "alter egos" of Alger and Roberta and thus may not hide behind their corporate veils to avoid from satisfying the tax assessments against Alger and Roberta; thus, the government argues that the plaintiffs' wrongful levy claim under I.R.C. § 7426, whether for injunctive or monetary relief, must necessarily fail.[11] The Court agrees with the government's conclusion but travels a slightly different path to reach that end.

Where the property at issue is in fact owned by the taxpayer, a third-party's wrongful levy claim under I.R.C. § 7426 fails. *See Lemaster v. United States*, 891 F.2d 115, 119 (6th Cir.1989); *Arth v. United States*, 735 F.2d 1190, 1193 (9th Cir. 1984); *Al–Kim, Inc. v. United States*, 650 F.2d 944, 947 (9th Cir.1979 & 1981); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 171–72 (D.C.Cir.1980), *cert. denied sub nom. Pacific Development, Inc. v. United States*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *Flores v. United States*, 551 F.2d 1169, 1171–72 (9th Cir. 1977).

In determining whether Alger and Roberta hold any interest in the assets under seizure, the Court must look to Louisiana state law. *See Zahra Spiritual Trust v. United States*, 910 F.2d 240, 242 (5th Cir. 1990). The lengths to which the Daigle went to disguise the answer is remarkable. Few, if any, however, would be fooled.

### 1.

The set of transfers in February 1989 were "a simulation, pure and simple, the purpose of which was to screen the property of [Alger and Roberta] from the pursuit of [their] creditors, and to enable [Alger and Roberta] to make use of [their car, van, houseboat, and three parcels of land] ... in the same manner as before." *Lawson v. McBride*, 121 La. 282, 46 So. 312, 317 (1908).

■ "A 'simulated contract' is one which, though clothed in concrete form, has no existence in fact, and it may at any time, and at the demand of any person in interest, be declared a sham and may be annulled by the [creditors] of the apparent vendor." *Succession of Terral*, 312 So.2d

---

10. Federal law governs this determination of who is a "purchaser" within the meaning of section 6323. *See Enochs v. Smith*, 359 F.2d 924, 926 (5th Cir.1966). The plaintiffs argue that because the shares of stock issued to Alger and Roberta constituted a "security" under Treas.Reg. 301.6323(h)–1(d), the plaintiffs are "purchasers." The plaintiffs provide no support, however, for their implicit position that this "security" had a value comparable to the "true value of the interest in the property acquired." Because this entire issue is immaterial, the Court leaves for another day whether the term "purchaser" includes a newly-formed, assetless corporation upon its initial issuance of stock.

11. The IRS may seize the assets of a taxpayer's "alter ego" to satisfy a tax assessment against the taxpayer. *See Zahra Spiritual Trust v. United States*, 910 F.2d 240 (5th Cir.1990); *see also Loving Savior Church v. United States*, 728 F.2d 1085, 1086 (8th Cir.1984) (per curiam); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 171–72 (D.C.Cir.1980), *cert. denied sub nom. Pacific Development, Inc. v. United States*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *Avco Delta Corp. Canada Ltd. v. United States*, 540 F.2d 258, 264–65 (7th Cir.1976), *cert. denied sub nom. Canadian Parkhill Pipe Stringing Ltd. v. United States*, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *G.M. Leasing Corp. v. United States*, 514 F.2d 935, 939–40 (10th Cir.1975), *rev'd in part on other grounds*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977).

296, 299 (La.1975). Whether a transaction constitutes a simulation turns on "the true intent of parties." *See generally* La.Civil Code art. 2025 ("A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties.").

The Court finds that the true intent of the Daigles in their transactions was not to transfer ownership of the properties for a legitimate estate planning purpose, but instead was for the Daigles to continue enjoying as property owners—with fructus, usus, and abusus, *see* La.Civil Code article 477—the full, unrestricted benefits of their property and to hinder and delay the IRS in its collection of taxes. Numerous self-evident reasons support this finding.

First, the Daigles continue to hold these assets out as their own. The Daigles have retained full possession and use of all the assets they purported to transfer to the plaintiffs. Title to the car and van is still registered to the Daigles; insurance is still issued solely in the Daigles' names; the Daigles are still using the land to refinance their bank loans. To all but the few who may peruse state title records, there is absolutely no indication of a change of ownership.

Second, the plaintiffs have exercised no dominion or control over these assets. They have not demanded, and the Daigles have not paid them, a single cent for this continued possession and use. Were a true transfer intended, then Anthony as both president and a director of the plaintiffs on the one hand and as trustee of the majority[12] shareholder in the plaintiffs on the other would be in gross dereliction of his fiduciary duties: he would be self-dealing and otherwise wholly imprudent to the detriment of the plaintiffs and ultimately of the trust by using the land and houseboat free of charge and by letting his parents likewise continue in such free use. *See generally* La.R.S. 9:2081–2097; La.R.S. 22:91–92.

Third, there is no evidence of any corporate act being undertaken beyond the February 1989 transactions and the single recordation of title for the houseboat in October 1989 (the latter act being suspiciously close in time to the scheduled meeting with the IRS about collecting the penalty assessments against Alger and Roberta). For example, there is no evidence that any shareholder or director meetings have ever been held or that any corporate management has been exercised over any of the assets purportedly transferred to it. As Anthony stated, the plaintiffs do no business.

Fourth, the transactions between the plaintiffs and Alger and Roberta make no economic sense. Certainly, the assets at issue, which are bearing no fruits or rents, are not the typical corporate assets. The Daigles have failed to present any cogent explanation of what *legitimate* reason they might have had to pursue their machinations, especially when it appears that Alger and Roberta's testamentary intent has been to leave to their two children in equal parts whatever net estate the couple may have.

Finally, and perhaps foremost, the transactions were made just before the Breaux & Daigle trial and just after the IRS had assessed tax penalties against Alger and Roberta.[13] The Court cannot overlook that the attorneys who were representing Breaux & Daigle in its refund action were the same attorneys who drew up the February 1989 transactions and who are representing the plaintiffs in this action; as Anthony admitted, these very attorneys had advised the Daigles that they would each be subject to personal penalty assessments if Breaux & Daigle lost its refund action. The Daigles' inconsistent explanations of delay in their "estate planning" are incredible. These transactions were not innocent coincidences in time, but calculated maneu-

---

**12.** The plaintiffs suggest that Alger and Roberta hold no interest in any of the plaintiffs. Even simulations aside, the statement is false: Alger would still hold 100 shares, and Roberta 250 shares, of Le Premier Products, Inc.

**13.** Even if the Court assumed, as the Daigles would suggest, that none of the Daigles had notice of the penalty assessments until after the February 1989 transactions, the Court's conclusion would be the same.

vers in an attempt to make any tax debt effectively unenforceable against Alger and Roberta.

In short, the "transfers" were shams made solely in anticipation of what would likely and did become final adverse tax rulings against the Daigles and their family-owned business.

### 2.

▮ Alternatively, even if there had been valid transfers with valid consideration given by the plaintiffs, the transfers would be subject to revocation. La.Civil Code article 2036 provides:

> An obligee has a right to annul an act of an obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency.

The plaintiffs suggest that the right of the IRS as obligee had not yet arisen in February 1989 because the IRS had not yet assessed the penalties against Alger and Roberta. As explained in Part II(A)(2) above, the factual premise is false: the assessments were made a month before, in January 1989. But the date of assessment is immaterial, for the right of the obligee (creditor) need not be liquidated at the time of the transfer from the obligor (debtor) to a third-person. *See Ventrilla v. Tortorice,* 160 La. 516, 107 So. 390, 392 (1926). Under I.R.C. § 6201, the IRS makes assessments for penalties or taxes still owing to the IRS, that is, when the IRS is already an obligee of the taxpayer; obligee status is a condition for, not a consequence of, assessment. In early 1986, the last of Breaux & Daigle's employment tax returns for 1985 was due and filed; in other words, by that time, the corporate liabilities underlying the basis for any penalty assessments had been incurred. Thus, the IRS had been an obligee of Alger and Roberta since that earlier time. *Cf. Zahra Spiritual Trust,* 910 F.2d at 947–48.

By "transferring" the bulk of their valuable assets to the plaintiffs and then "transferring" the bulk of their stock to an irrevocable trust, Alger and Roberta dissipated their estates so that they had little of record to their names and would not have enough to satisfy their penalty liabilities to the IRS; in other words, Alger and Roberta undertook acts that caused or increased their insolvency. Further, the whole set of transactions being a deliberate family affair, everyone associated with the transactions—Alger, Roberta, Anthony, and Losavio—knew (and should have known) that these acts would cause Alger and Roberta's insolvency. *Cf.* La.Civil Code arts. 2038–2039.

While revocatory actions under Louisiana law must be brought within a year of when the obligee learned or should have learned of the act at issue, *see* La.Civil Code art. 2041, the IRS is not bound by state law limitation periods. *Chevron, U.S.A., Inc. v. United States,* 705 F.2d 1487, 1491 (9th Cir.1983); *see United States v. Kellum,* 523 F.2d 1284, 1286 (5th Cir.1975) (citing, among others, *Phillips v. Comm'r of Internal Revenue,* 283 U.S. 589, 602–03, 51 S.Ct. 608, 614, 75 L.Ed. 1289 (1931)). Under I.R.C. § 6502(a), the IRS's collection of penalty assessments is timely as long as "the levy is made ... within 6 years after the assessment of the tax." The IRS has easily satisfied this limitation period. Further, unlike state-law creditors seeking to assert a revocatory claim under state law, the IRS is entitled under I.R.C. § 6331 to proceed with administrative seizure without prior judicial intervention or authorization. *See, e.g., United States v. Rodgers,* 461 U.S. 677, 682–83, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *see also Baddour, Inc. v. United States,* 802 F.2d 801, 807 (5th Cir.1986) (collecting cases rejecting constitutional challenges to seizures under I.R.C. § 6331). "[A]lthough the definition of underlying property interests is left to state law, the consequences that attach to those interests is a matter left to federal law." *Rodgers,* 461 U.S. at 683, 103 S.Ct. at 2137.

In sum, then, the plaintiffs failed to establish that Alger and Roberta hold no interest in the assets under seizure. The plaintiffs' wrongful levy claim, whether for injunctive or monetary relief, must fail.

### III.

In conclusion, the Court holds that there is no basis on the merits for injunctive or monetary relief under I.R.C. § 7426 and that the plaintiffs have no cause of action under I.R.C. § 7433. With as many pages as it wrote, the Court does not mean to suggest that the issue was at all close: it was not.[14]

The Court shall forthwith enter final judgment dismissing the entire action on the merits at the plaintiffs' costs.

---

**14.** Because the government has not so suggested directly, the Court does not decide at this time whether the slim position of the plaintiffs and their counsel violated F.R.Civ.P. 11 and/or 28 U.S.C. § 1927 and/or I.R.C. § 6673(b)(1).